Jorge A. **REYES–PEREZ, Appellant,**

v.

The **STATE of Texas, Appellee.**

No. 13–99–215–CR.

Court of Appeals of Texas, Corpus Christi.

April 26, 2001.

---

Noel Henry Reese, Gonzales, for Appellant.

W.C. Kirkendall, Dist. Atty., Seguin, for Appellee.

## OPINION

Justice YAÑEZ delivered the opinion of the Court, in which Chief Justice VALDEZ and Justices HINOJOSA and CASTILLO joined.

Pursuant to a plea agreement, appellant, Jorge A. Reyes–Perez, pleaded *nolo contendere* to possession of a controlled substance, more than four hundred grams of cocaine,[2] and was sentenced to twenty years imprisonment. Before entering the plea, the trial court denied appellant's pre-trial motion to suppress. By two points of error, appellant contends the trial court erred: 1) in denying his motion to suppress; and 2) in refusing to allow certain testimony at the suppression hearing concerning appellant's knowledge of his rights. We hold the trial court erred in denying appellant's motion to suppress. Accordingly, we reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

We first address our jurisdiction to hear this appeal. Where a defendant in a criminal action pleads guilty or *nolo contendere* and the punishment assessed is not greater than that recommended by the prosecutor and agreed to by the defendant, the notice of appeal must specify: (1) that the appeal is for a jurisdictional defect; (2) that the substance of the appeal was raised by written motion and ruled on before trial; or (3) that the trial court granted permission to appeal. *See* TEX. R.APP.P. 25.2(b)(3). Here, appellant filed a motion to suppress evidence prior to entering his plea. The notice of appeal specifies that appellant filed a pre-trial motion to suppress, which was ruled on by the trial court. Thus, the notice of appeal complies with the requirements of rule 25.2(b)(3). TEX.R.APP.P. 25.2(b)(3).

The court of criminal appeals has held that "a valid plea of guilty or *nolo contendere* 'waives' or forfeits the right to appeal a claim of error only when the judgment of guilt was rendered independent of, and is not supported by, the error." *Young v. State*, 8 S.W.3d 656, 667 (Tex.Crim.App. 2000). Here, we conclude that the judgment is not independent of the trial court's ruling on the motion to suppress and accordingly, we have jurisdiction to consider this appeal. *See id.* at 666–67.

### Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we afford almost

2. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (Vernon Supp.2001).

total deference to the trial court's determination of the historical facts that the record supports, especially when the trial court's findings turn on evaluating a witness's credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). We afford the same amount of deference to the trial court's ruling on "application of law to fact questions," also known as "mixed questions of law and fact," if resolving those ultimate questions turns on evaluating credibility and demeanor. *Ross*, 32 S.W.3d at 856; *Guzman*, 955 S.W.2d at 89. However, we review *de novo* questions of law and "mixed questions of law and fact" that do not turn on an evaluation of credibility and demeanor. *Ross*, 32 S.W.3d at 856; *Guzman*, 955 S.W.2d at 89. Where, as here, no findings of fact are filed by the trial court, "we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Ross*, 32 S.W.3d at 855.

■ A review of a trial court's ruling on a motion to suppress presents an application of law to a fact question. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex.Crim.App. 1999). For reasons discussed more fully below, we conclude that the mixed question of law and fact presented here—whether the State proved appellant's voluntary consent by clear and convincing evidence, under the totality of the circumstances—does not turn on an evaluation of credibility and demeanor. *See Loserth v. State*, 963 S.W.2d 770, 772–73 (Tex.Crim. App.1998) (holding *de novo* review appropriate where mixed question of law and fact did not turn on evaluation of credibility and demeanor).

■ Consent to search is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex.Crim.App.2000); *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim.App.1997); *Rangel v. State*, 972 S.W.2d 827, 832 (Tex.App.—Corpus Christi 1998, pet. ref'd). Although the federal constitution only requires the State to prove the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires the State to prove by clear and convincing evidence that consent to search was freely given. *Carmouche*, 10 S.W.3d at 331; *Reasor v. State*, 12 S.W.3d 813, 818 (Tex.Crim.App.2000); *Ibarra*, 953 S.W.2d at 245; *Cerda v. State*, 10 S.W.3d 748, 751 (Tex.App.—Corpus Christi 2000, no pet.). To be valid, a consent to search must be positive and unequivocal, and must not be the product of duress or coercion, either express or implied. *Reasor*, 12 S.W.3d at 818 (citing *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041); *Allridge v. State*, 850 S.W.2d 471, 493 (Tex.Crim.App.1991). Voluntary consent is not shown by a mere acquiescence to a claim of lawful authority. *Carmouche*, 10 S.W.3d at 331 (*citing Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)); *Harris v. State*, 994 S.W.2d 927, 930 (Tex.App.—Waco 1999, pet. ref'd). The trial court must look at the totality of the circumstances surrounding the statement of consent in order to determine whether consent was given voluntarily. *Reasor*, 12 S.W.3d. at 818; *Cerda*, 10 S.W.3d at 751. The extent of a search is limited to the scope of the consent given, and the scope of the consent is generally defined by its expressed object. *Guzman*, 955 S.W.2d at 89; *Vargas v. State*, 18 S.W.3d 247, 253 (Tex.App.—Waco 2000, pet. ref'd) (citing *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114

L.Ed.2d 297 (1991)). The showing that a suspect has been warned that he does not have to consent to the search and has a right to refuse is of evidentiary value in determining whether a valid consent was given. *Allridge,* 850 S.W.2d at 493.

■■■ The Waco Court of Appeals recently addressed the standard of review for determining voluntariness of a consent to search:

> The voluntariness of a consent to search is a mixed question of law and fact. The next question we resolve is whether the determination of this issue "turns" on the credibility and demeanor of the witnesses. The Court of Criminal Appeals has not addressed whether consent to search requires a *de novo* review under *Guzman.*[3] So the question becomes, if we believed everything one or more of the State's witnesses testified to, would it always add up to what is needed to decide whether the consent to search was voluntary? Because voluntariness is dependent on whether any duress or coercion was placed on the person giving the consent, we cannot say that it would. Thus, after giving deference to the historical facts, we must conduct a *de novo* review of whether the State proved by clear and convincing evidence that Vargas' consent to search his vehicle was voluntary.

*Vargas,* 18 S.W.3d at 253 (citations omitted).

■■■ In the present case, three officers and the appellant testified at the suppression hearing. Although the trial court was free to believe each officer's testimony and disbelieve appellant's testimony,[4] it was required to look at "the totality of the circumstances" surrounding the statement of consent in order to determine whether the State proved by clear and convincing evidence that the consent was positive and unequivocal, and not the result of duress or coercion. *Cerda,* 10 S.W.3d at 751. Even if we accept the officers' testimony, such testimony may not support a finding that the State established by clear and convincing evidence that appellant voluntarily consented to the search. *See Loserth,* 963 S.W.2d at 772 (holding *de novo* review appropriate where mixed question of law and fact did not turn on evaluation of credibility and demeanor); *Hunter v. State,* 955 S.W.2d 102, 105 n. 4 (Tex.Crim. App.1997) (*de novo* review was proper standard for determining whether a citizen was detained because issue did not turn on evaluation of credibility and demeanor). Accordingly, we hold that the question before us in this case—whether, under the totality of the circumstances, appellant voluntarily consented to the search—does not turn on an evaluation of credibility and demeanor, and is therefore subject to *de novo* review. *See Loserth,* 963 S.W.2d at 773.

### Discussion

At the suppression hearing, Deputy Sheriff Roger Tumlinson testified that on the afternoon of March 5, 1998, he and Officer David Kuntschik were monitoring traffic and drug interdiction on Interstate 10. The officers "clocked" appellant's vehicle on radar at 81 miles per hour.[5] The officers pulled the vehicle over and appellant got out. Tumlinson testified that he asked appellant for his license and proof of insurance. Appellant produced a Mexican

---

3. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

4. *See Allridge v. State,* 850 S.W.2d 471, 492 (Tex.Crim.App.1991).

5. Appellant apparently does not contest that he was speeding. Thus, the validity of the initial stop is not at issue.

driver's license and insurance documentation. Tumlinson further testified as follows:

Q [State]: Did it become apparent to you how much English he spoke?

A: It was very broken, but we managed to communicate.

Q: He spoke Spanish, I suppose?

A: No, most of the time he spoke in broken English to me.

Q: Were you able to understand what he was telling you?

A: Yes, sir. Mostly by gestures. He was gesturing a lot.

Tumlinson testified that he asked appellant if he was carrying anything illegal, and appellant said, "No, you look," and opened the car door, gesturing toward the interior of the car. While looking inside the vehicle, Tumlinson observed a battery holder on the floorboard on the rear passenger's side. While Tumlinson was searching the interior of the vehicle, Officer Kuntschik was inspecting the trunk. Kuntschik testified that he "pointed to the trunk" and appellant retrieved the keys and opened the trunk. In the trunk, Kuntschik found a plastic bottle, labeled in Spanish, containing a substance that smelled like battery acid. Officer Tumlinson testified:

Q[State]: What happened next?

A: I found the battery holder. I picked it up, looked at it; motioned to Deputy Kuntschik that I had found a battery holder. At this same time Deputy Kuntschik came out of the trunk with a yellow plastic bottle that had a substance in it, the type intended for the rejuvenation of a battery, an acid-like substance.

Q: All right. What did you do then?

A: At that point I asked the subject if there was anything under the hood; if he was hiding anything under the hood, or could we look and he said, no, he wasn't hiding anything; that we could look, but at the same time his eyes got very big; his mouth basically dropped open, and he began to sweat immediately.

Tumlinson testified that he lifted the hood of the vehicle, and smelled a strong odor of battery acid. The strong odor suggested that the battery was malfunctioning or that someone had tampered with it, causing the battery acid to spill out. The officers called on the radio and requested that a Spanish-speaking officer be sent to the scene. Shortly thereafter, Highway Patrolman Robert Ynclan arrived at the scene. Officer Ynclan testified that he spoke to the appellant in Spanish and asked him if the officers could look inside the battery. Ynclan testified that appellant nodded "Yes." The officers removed the top of the battery and discovered the contraband underneath the battery. Thereafter, appellant was advised of his rights in Spanish and was arrested.

On cross-examination, Tumlinson testified:

Q [Appellant's counsel]: So you used hand gestures?

A: Basically, yes, sir.

Q: You didn't communicate in Spanish?

A: No, sir, I am not that fluent in Spanish.

Q: And he didn't communicate in English?

A: His English was very broken.

* * * * *

Q: Indeed this was more of a show and tell game than a conversation like we are having right now?

A: More or less, yes.

* * * * *

Q: Okay. When you asked the subject to look under the hood, did you ask him in English or Spanish?

A: In English.

Q: Do you remember how you asked him in English?

A: Not word for word, no sir.

Q: Where were you at when you asked him this?

A: If I recall, I was standing at about the right side of the rear quarter panel looking into the trunk where Deputy Kuntschik brought that yellow bottle up and said, "look at this!"

Q: That is the passenger's side?

A: The passenger's side, away from the road, yes, sir.

Q: And where was the suspect at this point?

A: He was standing to my left between Officer Kuntschik and myself in a triangle-like shape. Officer Kuntschik was standing at the trunk; I was standing at the right side of the trunk, and the suspect was standing to my left and Officer Kuntschik's right; about four feet away.

Q: From both of you?

A: From both of us.

Q: Okay. And so he understood what "hood" was in English?

A: I suppose. I don't know. I have no earthly idea whether he understood it or not but I know, when I said it, immediately his eyes got large and his mouth dropped open and he began to sweat. He understood something. He understood that we wanted to look under that hood.

Q: Well, you said you were close to the back of the car, right?

A: Yes, sir.

Q: And you said that he spoke in broken English?

A: Yes.

Q: And you said that you didn't speak to him in Spanish?

A: No, I didn't.

Q: And you said that most of your communication was in sign language and not in a conversation like we are now having, right?

A: A combination of both.

Q: Oh, so now it is a combination of both; before it was just sign language.

A: A combination of me understanding very little Spanish and him understanding very little English and using sign language altogether.

Q: But you are at the back of the car?

A: Yes.

Q: Did you motion with your hand toward the hood or just say "hood"?

A: I don't recall at the time. It has been a long time ago.

Q: Okay. So, from what you are saying, I take it that you are not certain that you said "the hood", are you?

A: He understood I wanted to look underneath there due to the fact that his face did what it did and his eyes got large, his mouth dropped open, and he began to sweat. He knew we wanted to look under the hood.

Q: I understand that you are saying that his face started sweating and his eyes got big, but how is that an indication that he understood that you wanted to look under the hood?

A: I assume from experience.

Q: It was assumed; it wasn't unequivocal, was it?

A: I couldn't tell you that, sir. I couldn't tell you his thoughts.

Q: You couldn't tell us his thoughts, but you could tell us that he didn't speak good English?

A: Yes.

* * * * *

Q: Okay. You never informed the suspect of any of his rights, did you?

A: Not until after the contraband was located.

Q: You didn't tell him he didn't have to consent to the search did you?

A: Not that I recall, no.

Q: If you did, it would have been in English, right?

A: I don't think I would have said it in any language.

Q: Okay.

Officer Kuntshcik testified as follows:

Q [Appellant's counsel]: Okay. Now, you stated that you don't speak Spanish.

A: Correct. A very little bit, if any.

Q: Okay. When you all were communicating with Mr. Perez, he spoke very little English, correct?

A: Correct.

Q: And most of this was done through hand gestures?

A: That is correct.

Q: Like tapping on the hood?

A: Correct.

Q: Or tapping on the trunk?

A: Right.

Q: And you are saying that he gave you all consent to search the automobile, correct?

A: That is correct.

* * * * *

Q: Okay. I want to understand. You all didn't have perfect communications; that is your testimony, correct?

A: That is correct.

Q: Okay. Did you ever tell the Defendant he was free to leave?

A: No, I never told him he was being detained until after we found the battery, that something was wrong with it, and we believed there was contraband inside of it.

Q: Okay. Did you ever explain to him that he didn't have to give consent to search?

A: No, we didn't really during the time, except for the hood and me tapping on the trunk. I believe the only time that consent was asked was for the hood, but, you know, it is kind of hard when you have got the English speaker and the Spanish speaker to explain all of this.

Viewing the facts in the light most favorable to the trial court's ruling, we hold that the officers' testimony that they communicated with appellant solely by "hand gestures" is insufficient to constitute clear and convincing evidence of appellant's positive and unequivocal consent to the search. Accordingly, we hold that the trial court erred in denying appellant's motion to suppress evidence. Appellant's first point of error is sustained.

### Harm Analysis

 Having found error, we must now determine whether appellant was harmed by the admission of the contraband. Because the error involved is of constitutional magnitude,[6] we must reverse unless we can determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX.R.APP.P. 44.2(a);[7] *Veal v. State,* 28 S.W.3d 832, 838

---

6. The error involved is constitutional because it implicates the right to be free of unreasonable searches and seizures under the federal and state constitutions. *See* U.S. CONST. amend. IV, XIV; TEX. CONST. art. I, § 9.

7. Texas Rule of Appellate Procedure 44.2(a) provides:

Constitutional Error. If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a

(Tex.App.—Beaumont 2000, no pet.); *Villalobos v. State,* 999 S.W.2d 132, 136 (Tex. App.—El Paso 1999, no pet.). Without the contraband, the State could not have successfully prosecuted appellant. Therefore, we cannot say, beyond a reasonable doubt, that the trial court's error did not contribute to appellant's conviction. *See Veal,* 28 S.W.3d at 838; *Villalobos,* 999 S.W.2d at 136.

Because we have sustained appellant's first point of error, it is not necessary for us to reach the merits of his second point, and we decline to do so. *See* Tex.R.App.P. 47.1. We reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.

Justice J. BONNER DORSEY, filed a dissenting opinion, in which Justice NELDA V. RODRIGUEZ and Retired Chief Justice ROBERT J. SEERDEN joined.

Dissenting Opinion by Justice DORSEY.

Reyes–Perez appeals the trial court's denial of his motion to suppress contending that the cocaine was seized as the result of an unlawful search. I would find that, giving due regard to the trial court's historical findings of fact, the evidence is sufficient to show that Reyes–Perez consented to the search. Accordingly, I would uphold the trial court's denial of the motion to suppress.

When reviewing a trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review, giving "almost total deference to a trial court's determination of historical facts" and reviewing de novo the court's application of the law of search and seizure. *Carmouche v. State,* 10 S.W.3d 323, 327–28 (Tex.Crim.

App.2000); *Guzman v. State,* 955 S.W.2d 85, 88–89 (Tex.Crim.App.1997). When the trial court does not make explicit findings of historical fact, we review the evidence in a light most favorable to the trial court's ruling. *Carmouche,* 10 S.W.3d at 327–28. "In other words, we will assume that the trial court made implicit findings of fact supported in the record that buttress its conclusion." *Id.* at 328. Then, we conduct a de novo review of the lower court's application of the relevant Fourth Amendment standards. *Id.*

The trial court in this case made no explicit historical fact findings. Therefore, we assume that it made those implicit findings that support its conclusion. At the hearing on the motion to suppress, the State presented the testimony of the three police officers on the scene when Reyes–Perez was stopped and searched. Deputy Sheriff Roger Tumlinson testified that he initially stopped Reyes–Perez after clocking him on radar traveling 81 miles per hour. He said that Reyes–Perez exited his vehicle and they both walked to the back of the vehicle to get out of the way of traffic. Deputy Tumlinson stated that Reyes–Perez produced a Mexican driver's license and it became apparent that his English was broken. Tumlinson said that his English was "very broken, but [they] managed to communicate." He said that Reyes–Perez spoke to him in broken English rather than Spanish, and that they communicated "mostly by gestures."

Tumlinson said that after Reyes–Perez produced his driver's license and insurance, the officer asked him if he was carrying anything illegal in his vehicle. Tumlinson said that at that point, Reyes–Perez said, "No, you look." The officer testified further:

judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

Tex.R.App.P. 44.2(a).

When he said that, he walked up to the car and opened the door on the car. I began to look in the car and he made a gesture with his hands for me to look. He said, "Look. You look." He opened the door and done like that (indicating) and I began to look in the car. At that time the Deputy with me asked him if he had anything in the trunk and he retrieved the keys himself out of the ignition and opened the trunk and gestured again.

Tumlinson said that Reyes–Perez made a gesture as if to be indicating to the interior of the trunk. Tumlinson explicitly denied asking Reyes–Perez to get the keys and open the trunk. Tumlinson said that while searching the inside of the vehicle, he found on the floorboard on the right rear passenger's side, what appeared to be a battery holder. About the time he found that, the other officer found a yellow plastic bottle in the trunk that appeared to contain an acid-like substance. Tumlinson said that they asked him if he was hiding anything under the hood and if they could look and he said, "no he wasn't hiding anything, that we could look," but Tumlinson said that "at the same time his eyes got very big, his mouth basically dropped open, and he began to sweat immediately."

Tumlinson said that when they looked under the hood, the smell of battery acid was so strong it made his eyes water. He noticed that it was a particular type of battery that he had been trained to recognize as one frequently used for transporting drugs. At that point, Tumlinson called for a Spanish interpreter. Before the interpreter arrived, he opened the caps on the top of the battery with a screwdriver and ran a screwdriver down in it. He found that the screwdriver would only go down about four inches, which indicated to him that there was something blocking it. After testing the battery with the screwdriver, he handcuffed Reyes–Perez.

When the interpreter arrived, they brought Reyes–Perez to the right front of the vehicle and asked him in Spanish what was in the battery. He responded that he did not know. They asked if they could remove the top of the battery and look inside. He shook his head to indicate, "Yes." When they looked inside the battery, they saw a package containing approximately a kilo of cocaine.

Sheriff's Deputy David Kuntschik, who was the second officer involved in the stop and search, also testified. He offered little new information, but corroborated Tumlinson's version of the facts. Also, Highway Patrolman Robert Ynclan testified consistently with both officer's version of the facts. Ynclan was the interpreter called to the scene to translate when they sought to search inside the battery.

The defense offered the testimony of Reyes–Perez. His testimony sharply contradicted that of the officers in some key respects. First, he said that the officer asked him to get out of the car and show him what was in the trunk. He said that immediately after stopping him and checking his licence, the officer asked him if in Spanish if he was carrying any "pistols or drugs." He said no. He did not say that he told the officers to look for themselves. He said that the officers made him stand with his back to his own vehicle, with his hands on their patrol car. He said that he couldn't see them searching his car. He specifically denied giving the officers consent to search his car. Also, Reyes–Perez said that he did not know he was free to leave while the officers were searching his car, or he would have done it. Reyes–Perez also testified that the laws in Mexico are different and that he was unaware of his rights upon being stopped by an American police officer.

The protections afforded by the Fourth Amendment may be waived by an individu-

**322**

al who consents to a search. *Kolb v. State,* 532 S.W.2d 87, 89–90 (Tex.Crim.App.1976). When the State relies on consent to justify a warrantless search, it must show by clear and convincing evidence that appellant's consent was freely and voluntarily given. *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim.App.1991). The consent must be shown to be positive and unequivocal, and there must not be any duress or coercion. *Allridge,* 850 S.W.2d at 493; *Meeks v. State,* 692 S.W.2d 504, at 509 (Tex.Crim.App.1985). Whether a consent to search was in fact voluntary is a question of fact to be determined from the "totality of the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Juarez v. State,* 758 S.W.2d 772, 776 (Tex.Crim.App.1988). Texas follows this test.

The trial court, as the finder of fact, was free to believe the officers' testimony and disbelieve that of Reyes–Perez. *Green v. State,* 934 S.W.2d 92, 98 (Tex.Crim.App. 1996). We must afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman,* 955 S.W.2d at 89. The officers both testified that upon asking only a few questions, Reyes–Perez volunteered to let them look into the vehicle. They testified that he opened the trunk without being asked. Reyes–Perez clearly consented, according to the officers' version of the facts. The trial court believed the officers' version in overruling the motion to suppress. I would affirm.

Justice NELDA V. RODRIGUEZ and Retired Justice ROBERT J. SEERDEN join in this dissent.