In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00045-CR
______________________________


WILLIAM CHARLES MALONE, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 30309-B


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

            A Gregg County jury found William Charles Malone guilty of aggravated sexual assault,
sexual assault, and indecency with a child in connection with the sexual abuse of his daughter, J.M.,
age thirteen at the time of her outcry. The jury then recommended punishment of thirty years'
confinement each for the offenses of aggravated sexual assault and sexual assault, and twenty years'
confinement for the conviction for indecency with a child. Having requested and heard statements
of counsel regarding stacking of the three sentences, the trial court followed the jury's
recommendations for sentencing and ordered that the sentences run consecutively. On appeal,
Malone contends that the trial court erred in admitting expert testimony offered by the State, that the
trial court erred by overruling his motion to suppress, that the trial court erred in refusing to instruct
the jury on the legality of the search that yielded certain items of evidence, and that the sentences
imposed were disproportionate. We affirm.
I.         EXPERT TESTIMONY
            In his first point of error, Malone complains of the trial court's admission of the testimony
of the State's expert witness, Jamie English, the program director at the Children's Advocacy Center
of East Texas in Longview. 
A.        English's Qualifications and Testimony
            English testified she had earned a bachelor's degree in social work and was working toward
her master's degree. She is a licensed social worker and a member of the American Professional
Society on the Abuse of Children. She testified she had completed more than 600 forensic
interviews of children. Additionally, she had been to several week-long training sessions relating
to topics concerning child abuse and family violence. She also attended several conferences on
forensic interviewing of child victims. Although she had testified in other cases, she had not been
qualified as an expert. She reviewed the police report and several scholarly articles before testifying. 
The articles concerned incest, situational offenders versus pedophilia, and narcissistic personality
disorder. 
            On voir dire, English explained she "would testify to the types -- the different types of
pedophilia versus situational offender and narcissistic personality disorder . . . ." Concluding that
her generalized testimony would aid the jury, the trial court overruled Malone's objections to the
expert testimony. 
            Before the jury, English testified that, in general, some individuals turn to children as sexual
partners because those individuals may have personality defects. Relying on the Diagnostic and
Statistics Manual (DSM-IV), she described the characteristics of narcissistic personality disorder and
explained that this is one type of personality who may commit incest. She also provided general
testimony about child abuse victims. She did not specifically diagnose Malone as an incest
perpetrator. 
B.        Applicable Law: Rule of Evidence and Cases
            Rule 702 of the Texas Rules of Evidence


 states if scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or education may testify
thereto in the form of an opinion or otherwise. Tex. R. Evid. 702; Alvarado v. State, 912 S.W.2d
199, 215 (Tex. Crim. App. 1995). 
            Under Tex. R. Evid. 702, the trial court must be satisfied that three conditions are met before
expert testimony is admitted: (1) the witness qualifies as an expert by reason of his or her
knowledge, skill, education, training, or experience; (2) the subject matter of the testimony is an
appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the
jury in deciding the case. Alvarado, 912 S.W.2d at 215–16; Hardin v. State, 20 S.W.3d 84, 91 (Tex.
App.—Texarkana 2000, pet. ref'd); Bui v. State, 964 S.W.2d 335, 344 (Tex. App.—Texarkana 1998,
pet. ref'd). Malone challenges the trial court's admission of English's testimony on the grounds that
she was not properly qualified and that her testimony was not sufficiently reliable to assist the jury.
            1.         Qualification Inquiry
            No rigid formula exists for determining whether a particular witness is qualified to testify as
an expert. Alvarado, 912 S.W.2d at 215–16; Hardin, 20 S.W.3d at 91; Bui, 964 S.W.2d 344. The
United States Supreme Court emphasized that this inquiry was "a flexible one." Daubert v. Merrell
Dow Pharms., Inc., 509 U.S. 579, 594 (1993). The expertise must be measured against the particular
opinion the expert is offering. Roise, 7 S.W.3d at 234. While the proponent of the testimony has
the burden of establishing the expert's qualifications, the trial court has the responsibility to ensure
that "those who purport to be experts truly have expertise concerning the actual subject about which
they are offering an opinion." Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996); see Matson v.
State, 819 S.W.2d 839, 851 (Tex. Crim. App. 1991).
            A degree alone is not enough to qualify a purported expert to give an opinion, as the case may
be, on every conceivable medical question, legal question, or psychological question. Roise,
7 S.W.3d at 234. The inquiry must be into the actual qualification. That is, there must be a "fit"
between the subject matter at issue and the expert's familiarity therewith. See Broders, 924 S.W.2d
at 153. The proponent must establish that the expert has knowledge, skill, experience, training, or
education regarding the specific issue before the trial court which would qualify the expert to give
an opinion on that particular subject. Id.
            2.         Reliability Inquiry
            The proponent of scientific evidence must show, by clear and convincing proof, that the
evidence is sufficiently reliable and relevant to assist the jury in understanding other evidence or in
determining a fact issue. Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); Salazar
v. State, 127 S.W.3d 355, 359 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd [4 pets.]).
            In Nenno v. State, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), the Texas Court of Criminal
Appeals stated "an appropriately tailored translation of the Kelly test" for expert testimony outside
the hard sciences. When the expert is from a discipline which involves technical or other specialized
knowledge, experience, and training as opposed to the scientific method, the test for reliability is:
(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's
testimony is within the scope of that field, and (3) whether the expert's testimony properly relies on
and/or utilizes the principles involved in the field. See Weatherred, 15 S.W.3d at 542; Nenno, 970
S.W.2d at 561.
C.        Standard of Review
            We review the trial court's decision to admit expert testimony for abuse of discretion.
Alvarado, 912 S.W.2d at 216; Hardin, 20 S.W.3d at 90. The test for determining whether an abuse
of discretion occurred is not whether the facts present an appropriate case for the trial court's action;
rather, the test is whether the trial court acted without reference to any guiding rules and principles,
or in other words, acted in an arbitrary and unreasonable manner. Roise, 7 S.W.3d at 233.
D.        No Abuse of Discretion in Admission of Expert Testimony
            1.         On English's Qualifications and Scope of Her Expertise
                        a.         Opinions on Abuse Victims' Tendencies
            Clearly, the trial court did not abuse its discretion by concluding English was an expert who
could testify as to the behavioral tendencies of child abuse victims, in light of her extensive
education in the field of social work, her extensive training through conferences on child abuse and
family violence, and her specialized experience in conducting over 600 forensic interviews of child
victims. 
                        b.        Opinions on Offender Profiles
            The "fit" between English's expertise and her testimony on the types of incest offenders is
less comfortable. First, to the extent her testimony was based on the DSM-IV, Malone waived any
error when he affirmatively did not object to the admission of the portion of the DSM-IV on the topic
of narcissistic personality disorder. See Moraguez v. State, 701 S.W.2d 902, 904 (Tex. Crim App.
1986). When the State offered the excerpt from the manual, Malone stated that he "[has] no
objection as to a summary of her testimony." 
            As to the remainder of English's testimony on offender profiles, that which she based largely
on articles from the internet, the question is whether English testified within the scope of her
expertise by incorporating as her own those opinions expressed in the reviewed articles. She did
have advanced education and training in a behavioral sciences field, had significant experience
dealing with the victims of abuse, and had attended training conferences on child abuse and family
violence. Her testimony seems to lie in a more specialized field, one relating to psychological
profiles of the sexually deviant and one probably better suited to one in that specific field.


 While
such a situation may easily run afoul of the Nenno standard and we urge caution in this scenario, here
we have a unique set of circumstances. English had extensive experience in dealing with sexually
abused victims. Considering her experience and her education in the behavioral sciences in general
and in the area of child abuse more specifically, she is in a position in which she would be able to
evaluate, interpret, and incorporate research articles on topics of personality types with the tendency
to commit incest.
            While we may not have made the same determination as the trial court on this matter, we
cannot conclude the trial court's decision fell outside the zone of reasonable disagreement. 
Considering English's education, training, and experience, the trial court did not act arbitrarily or
unreasonably in overruling Malone's objection to English's expert testimony on the basis of her
qualifications.
            2.         On the Reliability of English's Testimony
            As to the reliability of her testimony, the trial court also acted within its discretion by
overruling Malone's objections. In preparation for her testimony, English reviewed several journal
articles on the characteristics of incest offenders and narcissistic personality disorders. She testified
she applied the profile of the situational offender as a possibility on these facts. She explained that
the situational offender is not an individual who has sexual urges for children. Rather, the situational
offender may act on some sexual urges in certain circumstances. She reviewed research on the
situational offender explaining how an individual may have only one or two victims rather than
several. She then explained how the profile of and the theories underlying the situational-offender
diagnosis have developed over time. 
            She then testified that a narcissistic personality disorder can be linked to a situational
offender. To explain the narcissistic personality disorder, as a personality type connected with
commission of incest, she relied heavily on the diagnosis descriptions found in the DSM-IV, the
psychological standard recognized in the fields of behavioral science such as psychology and social
work, which was introduced without objection. Based on this testimony, the trial court was
reasonable in determining that English's testimony satisfied the reliability inquiry under Nenno. We
overrule Malone's first point of error.
II.       MOTION TO SUPPRESS
A.        Two Searches of the Malone Residence
            1.         April 26, 2002
            This first search was a warrantless search, based on a consent-to-search form signed by James
Malone, appellant Malone's hearing-impaired brother. On April 26, 2002, the day of J.M.'s outcry,
Sergeant Terry Roach, Officer Carol Brian, Child Protective Services (CPS) investigator Audrey
Hobson, J.M., J.M.'s older brother, and James left the police station and went to the Malone
residence to get the children's personal belongings and to retrieve a bullwhip, pairs of panties, and
a nightgown referenced in J.M.'s allegations. 
            Having already entered the house, Roach obtained a consent form from James. He explained
that, since James is hearing-impaired, the officers had to get J.M. or her brother to translate for them. 
James is deaf and is unable to speak. Roach also testified that James lived at the residence and
"stayed in the living room." Roach testified that the officers explained, through translation, the
nature of the form James was asked to sign and that James had come from the police station, where
he had submitted a statement on the alleged crimes. J.M.'s account of the police interaction with
James was markedly different from that of the officer, however. 
            For purposes of our analysis, we will treat separately the search of Malone's bedroom and the
search of common areas. Based on James's consent, officers seized from underneath Malone's bed
a yellow folder containing mostly drawings of nude women, a gray plastic mechanical device, a
Polaroid camera, twelve Playboy magazines, and some marihuana and drug paraphernalia. The
officers seized an adult videotape and an innocuous photograph of Malone and J.M. from the
common areas of the house. Also, J.M. turned over to the officers the articles of clothing referred
to in her allegations against Malone.
            2.         May 1, 2002
            The second search of the residence was based on a search warrant obtained after Malone's
acquaintance spoke with investigating officer, Page Johnson, and directed him to the location of
nude photographs. Malone does not complain of the legality of this second search.
B.        Standard of Review
            At a hearing on a motion to suppress evidence, the trial court is the sole and exclusive trier
of fact and the judge of the credibility of witness testimony. Allridge v. State, 850 S.W.2d 471, 492
(Tex. Crim. App. 1991). We review the trial court's ruling on a motion to suppress under a
bifurcated standard of review, giving almost total deference to the trial court's determination of
historical facts and reviewing de novo the court's application of the law. Carmouche v. State, 10
S.W.3d 323, 327 (Tex. Crim. App. 2000).
C.        Consent Search of Malone's Bedroom
            1.         Actual Authority
            Consent to search is one of the well-established exceptions to the constitutional requirements
that an officer have both a warrant and probable cause before a search. Schneckloth v. Bustamonte,
412 U.S. 218, 219 (1973); Carmouche, 10 S.W.3d at 331. A warrantless entry and search by law
enforcement officers does not violate the Fourth Amendment's protection against unreasonable
searches and seizures if the officers have obtained the consent of a third party who possesses
common authority over the premises or effects to be searched. United States v. Matlock, 415 U.S.
164, 170 (1974). "Common authority" rests "on mutual use of property by persons generally having
joint access or control for most purposes." Id. at 170 n.7. A third party may properly consent to a
search when the party has equal control over and equal use of the premises being searched. Maxwell
v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); Becknell v. State, 720 S.W.2d 526, 528 (Tex.
Crim. App. [Panel Op.] 1986); Rivera v. State, 59 S.W.3d 268, 273 (Tex. App.—Texarkana 2001,
pet. ref'd); Corea v. State, 52 S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).
            The Texas Court of Criminal Appeals has recognized the privacy considerations in an
individual's bedroom when it held as inadmissible the evidence seized from an adult son's bedroom
in a search authorized by the father/homeowner. See Becknell, 720 S.W.2d at 528. In Becknell, the
father testified he was allowed to go into his son's bedroom "only when [his son] was there." Id. 
The evidence also showed that appellant Becknell had the only key to the locked room. Id. The
court concluded the father did not have actual authority to consent to a search of the son's bedroom.



            The locked or unlocked distinction became less important in Corea. The State showed that
the appellant's brother-in-law did have authority to common areas of the apartment. Corea, 52
S.W.3d at 316. However, the State failed to show that the brother-in-law had the authority to
consent to a search of the appellant's bedroom. Id. The Corea court rejected the State's argument
that the open door to the bedroom was evidence showing the brother-in-law's common authority over
the bedroom. Id. at 316–17. The brother-in-law had told police at the scene that no one other than
Corea lived in the bedroom, and so, the court concluded, the brother-in-law did not have equal
control and access to the bedroom that would give him the authority to consent to a search of the
bedroom. Id. at 316.
            Here, Sergeant Roach testified that James lived in the house, but added that James "stayed
in the living room." When asked if James occupied the same bedroom as Malone, investigating
officer Johnson


 answered, "Not to [his] knowledge." From this, we conclude the State failed to
show that Malone's adult brother, although living in the house, had equal control of Malone's
bedroom. That being said, James did not have actual authority to consent to a search of Malone's
bedroom.
            2.         Apparent Authority
            When the facts do not support a finding of actual authority, a search is reasonable if the
consent giver apparently has actual authority. Rodriguez, 497 U.S. at 188. In Rodriguez, the United
States Supreme Court held that a warrantless entry by law enforcement officers onto a person's
premises does not violate the protection against unreasonable searches and seizures under the Fourth
Amendment when such entry is based on the consent of a third party whom the officers, at the time
of the entry, reasonably believe to possess common authority over the premises, but who in fact does
not possess such authority. 
            If officers reasonably believed that the third party had common authority over the place to
be searched, then their good-faith mistake will not invalidate the search. This deference does not
mean, however, that they may rely on consent given in ambiguous circumstances or that clearly
appears unreasonable. Riordan v. State, 905 S.W.2d 765, 771 (Tex. App.—Austin 1995, no pet.).
While the apparent authority doctrine should not be applied so strictly that it places too heavy a
burden on police, it cannot allow law enforcement officers to proceed without inquiry into
ambiguous circumstances or to always accept at face value the consenting party's apparent
assumption or claim of authority to allow the contemplated search. Id.
            We acknowledge that the Texas Court of Criminal Appeals has not expressly adopted the
apparent authority doctrine.


 McNairy v. State, 835 S.W.2d 101, 105 (Tex. Crim. App. 1991). 
Without formally adopting the doctrine, the court found it to be of some value in the resolution of
McNairy. Id. It noted that the apparent authority doctrine was helpful in determining whether the
officers were justified "in being where they were" when probable cause to conduct a warrantless
search arose. Id. Citing Rodriguez, the court went on to explain that, should "ambiguous
circumstances" arise which cast doubt on the effectiveness of the consent or the extent of the consent
given, the officers "must stop and make inquiries as to the continued effectiveness of the consent." 
Id. The McNairy court rejected the application of the apparent authority doctrine under the evidence
in that case. Id.
            The State bears the burden of proving that the person who gave consent had the actual or
apparent authority to do so.


 Rodriguez, 497 U.S. at 181. The State cannot satisfy this burden if
officers proceed without making further inquiry into an ambiguous situation. Corea, 52 S.W.3d at
317. If the officers do not learn enough and if the circumstances make it unclear whether the
property is subject to "common authority" by the person giving consent, "then warrantless entry
without further inquiry is unlawful unless authority actually exists." Rodriguez, 497 U.S. at 188–89.
            In Riordan, an officer, acting on a tip from Riordan's twelve-year-old son, conducted a
warrantless search of Riordan's home based on the consent of an elderly woman, who was the only
person present at the time of the officers' arrival. Riordan, 905 S.W.2d at 768–69. The officers
learned the woman's name and her purpose for being there. They also learned the location of her
separate residence and that the homeowners would be home shortly. Id. at 768. The officers seized
marihuana from the master bedroom and the home office. Id. at 768–69. At the hearing on the
motion to suppress, it was determined that the woman who consented to the search was Riordan's
mother-in-law, who lived in a nearby house Riordan and his wife had built for her on their property. 
Id. at 769.
            The mother-in-law ate her meals at the Riordan home and also sometimes watched television
there. Id. On occasion, as was the case at the time of this search, she also acted as a babysitter for
Riordan's twelve-year-old son while Riordan and his wife were at work. Id. The wife testified that
her mother was expressly denied access to the office and master bedroom. Id.
            The Austin Court of Appeals held that the mother-in-law did not have actual authority to
consent to the search of the bedroom and office and that "[t]he officer's superficial and cursory
questioning of [the mother-in-law] simply did not disclose sufficient information to support a
reasonable belief that she had the authority to permit the search." Id. at 772.
            Similarly, in Corea, since the brother-in-law had informed the police that no one other than
Corea lived in the bedroom, the circumstances did not support a reasonable belief that the brother-in-law had authority to consent to the search of the bedroom. Corea, 52 S.W.3d at 317. When the
circumstances regarding the brother-in-law's authority to consent appeared ambiguous, the police
were obligated to investigate further and/or obtain a search warrant. Id. Their search without having
done so was unreasonable.


 Id.
            3.         No Showing of Apparent Authority to Consent To Search of Bedroom
            Likewise, the circumstances surrounding James's authority to consent to a search of Malone's
bedroom are ambiguous. Since the officers proceeded without further inquiry in the face of this
ambiguity, they acted unreasonably with respect to their search of Malone's bedroom based on
James's consent.
            In Davis, 93 S.W.3d at 668, this Court held that officers were reasonable in concluding that
a female, who stated she lived in the one-bedroom residence, had authority to consent to a search. 
In the bedroom, officers found a firearm under the bed and, subsequently, Davis was prosecuted for
possession of a firearm as a felon. The trial court overruled Davis's motion to suppress the firearm. 
Id. at 665, 668. Later, it was determined that the female who consented to the search was an in-law
that stayed with Davis on weekends. Id. at 668. While she did not have actual authority to consent
to the search of the bedroom, the officers were reasonable in believing that a female living in a one-bedroom residence had equal access to the bedroom. Id. The same cannot be said under the
circumstances here, however, where it is far less likely that two grown brothers will share a bedroom
and, more obviously, where officers discovered James did not occupy the bedroom.
            Again, investigating officer Johnson indicated he knew James did not share the bedroom with
Malone. Sergeant Roach testified that James "stayed in the living room." Therefore, it was not
reasonable for the officers to proceed with the warrantless search pursuant to the apparent authority
of James to consent to a search of Malone's bedroom. As were the officers in Corea, the police
officers here were obligated either to investigate further to determine if James had the authority to
consent to a search of the bedroom, or obligated to obtain a search warrant. See Corea, 52 S.W.3d
at 317–18. We conclude the trial court erred in denying the motion to suppress because the State did
not sustain its burden of establishing that James had actual or apparent authority to consent to the
search of Malone's bedroom. That is, regardless of whether James gave voluntary consent, this
portion of the search is invalid because James legally could not give consent to a search of the
bedroom.
            The fruits of this unlawful search and seizure are those items seized from Malone's bedroom: 
a yellow folder of drawings, a bag of marihuana, drug paraphernalia, a gray plastic mechanical
device, a Polaroid camera, and twelve Playboy magazines. These items were seized unlawfully and
should have been excluded from evidence. 
            4.         No Reversible Error in Admission of Items Seized From Bedroom
            We next determine if the error in the trial court's overruling Malone's motion to suppress the
six items recovered from the bedroom constitutes reversible error. See Tex. R. App. P. 44.2. The
error here is constitutional error because an unlawful search by the State violates both the Fourth
Amendment and the Due Process Clause of the Fourteenth Amendment. See Tex. R. App. P. 44.2(a). 
If the record reveals constitutional error that is subject to harmless error review, we must reverse a
judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error
did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a); see Hernandez v. State,
60 S.W.3d 106, 108 (Tex. Crim. App. 2001).
            In assessing the likelihood that the jury's decision was adversely affected by the error, we
consider everything in the record, including any testimony or physical evidence admitted for the
jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged
error and its connection with other evidence, and whether the State emphasized the error. See
Motilla v. State, 78 S.W.3d 352, 357–58 (Tex. Crim. App. 2002); Strong v. State, 138 S.W.3d 546,
555 (Tex. App.—Corpus Christi 2004, no pet.).
            The marihuana and drug paraphernalia seized from Malone's bedroom were wholly unrelated
to the offense with which Malone was charged and for which he was, ultimately, convicted. The
magazines were relatively innocuous, as well, in relation to Malone's crimes. Similarly, the camera,
in and of itself, has only minimal bearing on the crimes of aggravated sexual assault and indecency
with a child here where, although J.M. testified Malone took nude photographs of her, no nude
photographs of J.M. were ever produced. The yellow folder contained mostly classic rock-and-roll
song lyrics, illustrated mottos, and amateur drawings of nude women, none of which have a strong
tendency to support an allegation of sexual assault or indecency with a child. 
            We conclude the evidence seized from the bedroom was not necessary to the State's case
against Malone. See Strong, 138 S.W.3d at 555. J.M.'s own uncontradicted and detailed account
of the abuse, testimony from friends and family, and the items J.M. turned over to police were at the
heart of the State's case. Considering the substantial evidence supporting the jury's verdict, the
nature of the items unlawfully seized, and the little emphasis placed on the evidence at issue, we
determine the error did not contribute to Malone's conviction.
D.        Search of the Common Areas of the Residence
            1.         Voluntariness of Consent To Search
            The voluntariness of a consent to search is a mixed question of law and fact. Reyes-Perez
v. State, 45 S.W.3d 312, 316 (Tex. App.—Corpus Christi 2001, pet. ref'd). The United States
Constitution requires only that the State prove voluntariness of consent by a preponderance of the
evidence, while the Texas Constitution requires the State to prove voluntariness of the consent by
clear and convincing evidence. Reasor v. State, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000);
Carmouche, 10 S.W.3d at 331. We have held that James could not have consented to a search of
Malone's bedroom. We now address the issue whether the State met its substantial burden regarding
a showing that James knowingly and voluntarily consented to the search of the rest of the residence.
            2.         Communication with James and Search of the Common Areas
            Sergeant Roach testified he explained the consent to search form to James through translation
by J.M. or her brother. Roach also explained that James had accompanied the group to the Malone
residence from the police station, where James had made a statement through an interpreter. He was
not aware of whether James could read. Roach testified he had no doubt as to whether James
understood he was consenting to a search of the residence. 
            However, J.M.'s account of the police interaction with James was very different. She
mentioned the presence of a family friend who might have been at the house and tried to explain the
search to James, even though the friend did not know sign language. J.M. described the police
officers trying to communicate with James through gestures. Taken as true, this type of
communication would probably not have been sufficient to sustain the burden to show voluntary
consent by clear and convincing evidence. See Reyes-Perez, 45 S.W.3d at 319. When asked whether
the officers asked her to communicate with James, J.M. testified that she did not think so. She could
not remember whether the officers enlisted the help of her brother in communicating with James. 
            From the common areas of the residence and independent of both J.M.'s efforts and the
unreasonable search of Malone's bedroom, the officers seized an adult videotape and an innocuous
photograph of Malone and J.M.
            3.         Evidence is Not Clear and Convincing that James Consented to the Search
            Since the evidence is unclear as to who communicated with James and whether that person
knew sign language, and since the officers were uncertain as to whether James could read the consent
form, we cannot conclude that the State showed by clear and convincing evidence James consented
to the search at all. We recognize that James had come with the officers and children from the police
station, where he had given a statement through the aid of an interpreter and that, therefore, James
was likely well aware of the circumstances. However, this evidence does not rise to the level of clear
and convincing when there are factual discrepancies regarding who communicated with James and
the manner in which information was communicated. The signed consent form becomes less
convincing as well since the officers testified they were uncertain as to whether James could read. 
The State failed to meet its burden of showing by clear and convincing evidence that James
voluntarily consented to the search. 
            4.         No Reversible Error In Admission of Items Seized from Common Areas
            The items seized from the common areas of the residence also should have been excluded. 
However, any error in their admission would also be harmless error in that these items, like those
seized from Malone's bedroom, did not contribute to Malone's conviction. Tex. R. App. P. 44.2(a). 
The adult videotape is not connected to the allegations of sexual assault and indecency with a child. 
The seized photograph is innocent in nature and shows a smiling father and daughter. We conclude
neither of these illegally obtained items contributed to Malone's convictions. 
III.      JURY INSTRUCTION ON LEGALITY OF SEARCH
            Malone proposed two different jury instructions to the trial court. These two proposed
instructions related to the jury's consideration of evidence in light of the legality of the search. The
trial court refused to include either instruction in the charge to the jury. Malone contends the trial
court erred by refusing to submit an instruction pursuant to Tex. Code Crim. Proc. Ann. art. 38.23
(Vernon 2005).


 
A.        When Article 38.23 Instruction Necessary
            In certain instances, the jury may be instructed that it is not to consider illegally obtained
evidence. Tex. Code Crim. Proc. Ann. art. 38.23(a). A ruling on a motion to suppress may rest
on legal rulings or factual findings, or some combination of the two. Pierce v. State, 32 S.W.3d 247,
251 (Tex. Crim. App. 2000). An instruction pursuant to Article 38.23 is only necessary when there
is a dispute regarding the factual basis for the ruling to admit evidence. Garza v. State, 126 S.W.3d
79, 85 (Tex. Crim. App. 2004); Pierce, 32 S.W.3d at 251.
B.        Contested Issues of Fact Regarding James's Consent
            Here, the record indicates there was a dispute regarding the factual basis for the trial court's
ruling at least with respect to the items seized from the common areas of the residence. Put another
way, there is a factual dispute regarding whether James gave knowing and voluntary consent to
search. Again, from the record, it is uncertain as to who communicated with James. It is also
uncertain as to whether James could read the consent form he signed.
            Since there is a factual dispute concerning the voluntariness of James's consent, the trial court
was "statutorily bound" to submit an Article 38.23 instruction to the jury. See Vrba v. State, 69
S.W.3d 713, 719 (Tex. App.—Waco 2002, no pet.). The trial court erred by refusing to submit to
the jury an instruction pursuant to Article 38.23.


 
C.        No Reversible Error In Failure To Submit Article 38.23 Instruction
            The harm standard in Article 36.19 applies to the omission of an Article 38.23 instruction. 
Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 1981); Atkinson v. State, 923 S.W.2d 21, 27 (Tex.
Crim. App. 1996). If the charge error was properly preserved, then we must reverse if the error is
"calculated to injure the rights of defendant." Escobar v. State, 28 S.W.3d 767, 777 (Tex.
App.—Corpus Christi 2000, pet. ref'd). Accordingly, this objected-to error requires reversal if
Malone suffered "some harm" from the omission. See Almanza v. State, 686 S.W.2d 157, 171 (Tex.
Crim. App. 1984) (op. on reh'g).
            While the trial court erred by refusing to submit to the jury an Article 38.23 instruction, its
failure to do so is harmless error. The jury should have been instructed to disregard the evidence if
it believes, or has a reasonable doubt, that the evidence was obtained unlawfully. Since, as we have
determined, the items, those seized from the living room, which would have been covered by the
instruction, did not contribute to Malone's conviction, the failure to instruct the jury that it may
disregard those items of evidence is harmless error. The trial court's failure to instruct the jury that
it may disregard evidence that has no bearing on the offense charged does not constitute "some
harm." 
IV.      DISPROPORTIONATE AND CONSECUTIVE SENTENCES
            With respect to Count I, aggravated sexual assault, the jury recommended that Malone serve
thirty-five years in Texas Department of Criminal Justice –Institutional Division (TDCJ-ID) and pay
a $10,000.00 fine. With respect to Count II, sexual assault, the jury also recommended that Malone
serve thirty-five years in TDCJ-ID and pay a $10,000.00 fine. Finally, the jury recommended a
punishment of twenty years and a $10,000.00 fine with respect to Count III, indecency with a child. 
Consistent with the State's request, the trial court ordered that the sentences run consecutively. 
Malone complains on appeal that each sentence was disproportionate to the offense and that the trial
court's decision to stack the sentences caused the sentences to be excessive. Due to the nature of
these complaints, we will treat each one in turn.
A.        Proportionality of Individual Sentences Not Preserved For Review
            A defendant must object that a sentence is disproportionate when the sentence is imposed or
else he or she loses the right to complain about the proportionality of the sentence on appeal. Tex.
R. App. P. 33.1; Rodriguez v. State, 71 S.W.3d 778, 779 (Tex. App.—Texarkana 2002, no pet.).
            Here, Malone failed to object to the sentences as disproportionate. In fact, when the trial
court read the jury's recommendations and asked if the parties had any questions, Malone stated he
did not. Going further, when asked to address the trial court's decision whether to stack the
sentences, defense counsel affirmatively waived this complaint:
Your Honor, I think the jury took careful time and consideration when making the
recommendations as to punishment and assessing this man's punishment. You've
heard the testimony from the family and to what their wishes were, the age of this
defendant, and the range of punishment that he received of 35 years, I believe is
appropriate. And I don't think stacking these sentences is appropriate in this case.

Thus, Malone has failed to preserve for our review the issue regarding the proportionality of the
individual sentences.
B.        No Abuse of Discretion in Stacking Sentences
            1.         Trial Court's Discretion
            The trial court is given discretion to order sentences to run consecutively or concurrently:
"[I]n the discretion of the court, the judgment in the second and subsequent convictions may either
be that the sentence . . . shall begin when the judgment and the sentence . . . in the preceding
conviction has ceased to operate, or that the sentence . . . shall run concurrently with the other case
or cases." Tex. Code Crim. Proc. Ann. art. 42.08 (Vernon Supp. 2004–2005). In light of the
discretion granted to the trial court by Article 42.08(a), we review a complaint about consecutive
sentences for an abuse of that discretion. See Macri v. State, 12 S.W.3d 505, 511 (Tex.
App.—San Antonio 1999, pet. ref'd). 
            2.         Limitations on Trial Court's Discretion
            Section 3.03 of the Texas Penal Code limits the trial court's discretion in stacking sentences: 
"When the accused is found guilty of more than one offense arising out of the same criminal episode
prosecuted in a single criminal action, a sentence for each offense for which he has been found guilty
shall be pronounced. Except as provided by Subsection (b), the sentences shall run concurrently."


 
The Legislature has defined "criminal episode":
the commission of two or more offenses, regardless of whether the harm is directed
toward or inflicted upon more than one person or item of property, under the
following circumstances:
(1) the offenses are committed pursuant to the same transaction or
pursuant to two or more transactions that are connected or constitute a
common scheme or plan; or
(2) the offenses are the repeated commission of the same or similar
offenses.

Tex. Pen. Code Ann. § 3.01 (Vernon 2003); see Baker, 107 S.W.3d at 673. 
            So, it would appear that Section 3.03(a) applies to Malone's prosecution and disallows
stacking of the sentences imposed here. However, Section 3.03(b) goes on to provide specific
instances where the trial court may impose consecutive sentences even though the sentences were
imposed for offenses arising out of the same criminal episode and prosecuted in a single proceeding. 
The pertinent portion of Subsection (b) reads as follows:
(b) If the accused is found guilty of more than one offense arising out of the
same criminal episode, the sentences may run concurrently or consecutively if each
sentence is for a conviction of:
 
. . . . 
 
(2) an offense:
(A) under Section 21.11, 22.011, 22.021, 25.02, or 43.25 committed
against a victim younger than 17 years of age at the time of the commission
of the offense regardless of whether the accused is convicted of violations of
the same section more than once or is convicted of violations of more than
one section; . . . .
Tex. Pen. Code Ann. § 3.03(b)(2)(A).
            Here, Malone was convicted of three of the listed offenses against J.M., who was younger
than seventeen years of age at the time of the offenses: aggravated sexual assault of a child in
violation of Tex. Pen. Code Ann. § 22.021 (Vernon Supp. 2004–2005), sexual assault in violation
of Tex. Pen. Code Ann. § 22.011 (Vernon Supp. 2004–2005), and indecency with a child in
violation of Tex. Pen. Code Ann. § 21.11 (Vernon 2003). By the plain language of Section 3.03(b),
the trial court acted within its discretion in ordering Malone's sentences to run consecutively. We
overrule Malone's contention to the contrary.
V.        CONCLUSION
            Having concluded either that Malone's points of error are without merit or that any trial court
error was harmless error, we affirm the trial court's judgment.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          November 19, 2004
Date Decided:             April 28, 2005

Publish