Dwayne F. VEAL, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–99–514 CR.

Court of Appeals of Texas,
Beaumont.

Submitted July 25, 2000.
Decided Sept. 27, 2000.

Bryan Laine, Beaumont, for appellant.

Tom Maness, Criminal Dist. Atty., Rodney D. Conerly, Asst. Criminal Dist. Atty., Beaumont, for state.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

Following the unsuccessful attempt at suppressing the contraband made the basis of the instant prosecution, appellant pleaded guilty to the felony offense of Possession of Marijuana and was sentenced by the trial court to confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of seven (7) years. As appellant conditioned his plea of guilty on the trial court's denial of appellant's pre-trial motion to suppress, we have jurisdiction to entertain this appeal. *See Young v. State,* 8 S.W.3d 656, 663 (Tex.Crim.App.2000). His three appellate issues complain of the stop, detention, and search of his vehicle as being violative of the Fourth and Fourteenth Amendments to the United States Constitution, Article 1, section 9 of the Texas Constitution, and Tex.Code Crim. Proc. Ann. art. 38.23 (Vernon Pamph.2000).

The facts surrounding the stop, detention, and search are not significantly in dispute. Officer Gary Porter of the Jefferson County Narcotics Task Force was the lone witness at the suppression hearing. Porter testified that he initially stopped appellant's vehicle, traveling east bound on Interstate 10 in Beaumont, Texas, because he observed said vehicle to abruptly change lanes without first signaling, and then stop while still in a lane of travel on the Interstate. While there is evidence in the record of the somewhat pretextual nature of Officer Porter's stop of appellant,

the Court of Criminal Appeals has held that an objectively valid traffic stop is not unlawful "just because the detaining officer had some ulterior motive for making it." *Crittenden v. State*, 899 S.W.2d 668, 674 (Tex.Crim.App.1995). Officer Porter provided the trial court with an objectively valid reason (traffic violation) for stopping appellant. We will not question the trial court's apparent sanction of the initial stop.

We now move on to the detention of appellant. Officer Porter explained the purpose of stopping appellant in the following manner: "To advise Mr. Veal that what he did was illegal and to see if any probable cause or anything developed that he might be carrying illegal narcotics. That is my job out there." When asked if it was his intention to give appellant a citation for the traffic violation, Officer Porter responded, "Not at the time; no, sir, it was not." So it appears the scope of Officer Porter's stop of appellant was merely to "advise" appellant "that what he did was illegal." Nevertheless, during direct examination by the State, Officer Porter then described the sequence of events that transpired next as follows:

Q. [State] And you identified Mr. Veal. What happened next?

A. [Porter] I initiated a traffic contact with him and told him why he was being stopped and asked him why he stopped in the middle of the road and refused to stop. And he was extremely nervous and he told me that he just didn't know what to do.

Q. Okay. And, what happened next?

A. I inquired as to the ownership of the vehicle. Mr. Veal was not the registered owner of the vehicle, if my memory is correct. I asked him for some paperwork on the vehicle. He went to the back of the vehicle and dug around in the glove box for a period of time. While he was digging around in the glove box, I inquired from Mr. Veal his travels due to the fact that I was suspicious he might be trafficking illegal drugs. Also, I noticed that Mr. Veal was wearing a dress shirt and a tie and that's not something you normally encounter up on the Interstate late at night like that. Most people, if they don't have to, will not wear a tie late at night.

Q. So, him wearing a dress shirt and tie at 12:30 in the morning, that was unusual to you; is that correct?

A. Well, it's slightly unusual and combined with what he had done when I tried to stop him and his nervousness even further heightened my suspicions that he might be up to something. While I was speaking with Mr. Veal, I had inquired about his travels and he had told me that he went to Houston which is a main source city as far as illegal drugs on the east coast of the United States. I asked him what he had done while he was in Houston and Mr. Veal had told me he went and visited his sister and they had [gone] out to eat that night. I asked him where they went to eat and Mr. Veal had to stop and think about it for several seconds, which is indicative of drug trafficking when you ask them what they've been doing, they don't—they can't answer you quickly because they have to stop and think about it, trying to legitimize the travels. Mr. Veal then told me that he stopped at Bennigan's.

At this point, Porter asked appellant if he was carrying anything illegal in his vehicle. When appellant responded that he was not, Porter requested to search appellant's vehicle. Appellant agreed at first, but then refused after Porter informed him he did not have to consent to a search. However, Porter informed appellant that he (Porter) had "plenty" of reasonable suspicion to detain appellant so that Porter's narcotics detection dog, Ali, could sniff the vehicle. Ali was then taken out of Porter's vehicle, made a pass around appellant's vehicle, and alerted on the rear area. Porter examined the trunk and discovered approximately 61.24 pounds of marijuana

in brick form wrapped in food wrap and fabric softener. Appellant was then arrested.

▮ Appellant argues that while Porter may have had probable cause to initially stop him, appellant's continued detention in order to permit Ali to sniff the vehicle exceeded the scope of the initial stop and was without reasonable suspicion. In determining whether Porter's actions lasted no longer than was necessary to effectuate the purpose of the detention, the purpose of the detention must initially be determined. *Davis v. State*, 947 S.W.2d 240, 242–43 (Tex.Crim.App.1997). As mentioned above, Porter stopped appellant to advise appellant that he had committed a traffic offense. During the stop, Porter had the right to request a driver's license, insurance papers, information on the ownership of the vehicle, the driver's destination, and the purpose of the trip. *Powell v. State*, 5 S.W.3d 369, 377 (Tex.App.— Texarkana 1999, pet. ref'd); *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex.App.— Fort Worth 1998, pet. ref'd). In addition, it would have been reasonable for Porter to check for any outstanding warrants. *Davis*, 947 S.W.2d at 245 n. 6. Once Porter had concluded all of the above and advised appellant of the traffic violation, he could no longer lawfully detain or question appellant unless he had reasonable suspicion to believe another offense was being committed. *See id.* at 245 & n. 6; *see also United States v. Sharpe*, 470 U.S. 675, 687, 105 S.Ct. 1568, 84 L.Ed.2d 605, 616 (1985).

▮ If, during the course of a valid investigative detention, the officer develops a reasonable suspicion that the detainee was engaged in, or soon would engage in criminal activity, a continued detention is justified. *See Davis*, 947 S.W.2d at 245. The Fourth Amendment bridles the government's power to invade a person's privacy by requiring that searches and seizures customarily be supported by a showing of probable cause. The lower standard of reasonable suspicion is derived from the probable cause standard and applies only to those brief detentions which fall short of being full-scale searches and seizures. *Woods v. State*, 956 S.W.2d 33, 35 (Tex.Crim.App.1997). The Supreme Court established this standard in response to the time-honored police practice of "stop and frisk." *Id.* This type of practice was deemed a necessary tool that would aid law enforcement in preventing imminent crimes and stopping ongoing crimes, as well as lending protection to officers and others in potentially threatening situations. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889, 911 (1968). In *Terry*, the Court recognized the precarious balance between a citizen's right to privacy and law enforcement's personal safety interests. 392 U.S. at 21, 20 L.Ed.2d at 905. To discourage harassment carried out indiscriminately based on social stereotypes, race, gender or other irrelevant personal characteristics, the Court explained that the officer must be able to point to specific articulable facts which, when taken together with rational inferences from those facts, reasonably warrant the detention. 392 U.S. at 21, 20 L.Ed.2d at 906. The Court emphasized that these facts must amount to something more than an "inchoate and unparticularized suspicion or hunch." 392 U.S. at 27, 20 L.Ed.2d at 909.

In *U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1, 10 (1989), Chief Justice Rehnquist, writing for the majority, explained that the concept of reasonable suspicion, like probable cause, cannot be reduced to "a neat set of legal rules." He noted that when a detention is based upon conduct by the suspect, it is clear that the conduct need not itself be unlawful or in some sense inconsistent with innocence. He further observed that innocent behavior will frequently provide the basis for a showing of probable cause, and in making a determination of probable cause, the relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular types of noncriminal acts. 490

U.S. at 10, 109 S.Ct. 1581, 104 L.Ed.2d at 12. According to Chief Justice Rehnquist, that principle applies equally as well to the reasonable suspicion inquiry. *Id.* In support of this analysis, he reasserted the rationale set-out in *U.S. v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981):

> In evaluating the validity of a stop such as this, we must consider "the totality of the circumstances— the whole picture." [citation omitted] As we said in Cortez:
>
>> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same— and so are law enforcement officers." [citation omitted]

*Sokolow*, 490 U.S. at 8, 109 S.Ct. 1581, 104 L.Ed.2d at 10.

Officer Porter testified to five facts that, when added together, provided him with reasonable suspicion to further detain appellant so as to permit Ali to make a sweep of appellant's vehicle. The first fact that "heightened" Porter's suspicion was that appellant initially slowed down when Porter activated his emergency lights, but appellant did not stop and then "slammed on his brakes in the middle of the Interstate" causing Porter to take evasive action to keep from being struck by an "18–wheeler." Porter explained that in his experience as a drug intervention officer, suspects try to get him to pass them up because they are trying to conceal the fact they are carrying contraband. The second fact Porter recalled was that appellant was wearing a dress shirt and still had a necktie on at 12:30 a.m. while driving on the interstate. Third was the fact that appellant stated he was returning from Houston which Officer Porter characterized as "a main source city as far as illegal drugs on the east coast of the United States." The fourth fact was that appellant took "several seconds" to answer the question about where he and his sister had eaten in Houston that night. And the fifth fact was appellant's level of nervousness, which Porter described as, "His voice was shaking, his hands were shaking. It—his particular actions keyed me that this guy is a lot more nervous than the average traffic violators that I encounter."

■ We are presented here with what has been accepted by courts for some time as a legitimate law enforcement technique for articulating reasonable suspicion: the drug courier profile. *See Sokolow*, 490 U.S. at 10, 109 S.Ct. 1581, 104 L.Ed.2d at 12. There is no doubt that Officer Porter was an experienced drug intervention officer, having worked in that capacity for seven years at the time of the hearing. Yet, we review the existence of reasonable suspicion *de novo* when the trial judge is not in an appreciably better position to decide the issue. *See Guzman v. State*, 955 S.W.2d 85, 87 (Tex.Crim.App.1997). This is the case when credibility determination is not a factor at the hearing. In the instant case, as Officer Porter was the only witness called by either party, and his rendition of the facts was not impugned, the trial judge was in no better position than we are now in his ability to apply the law to the historical facts before him. *See also Loserth v. State*, 963 S.W.2d 770, 773 n. 2 (Tex.Crim.App.1998).

■ Our review of Porter's rendition of the five facts he claimed provided him with reasonable suspicion to further detain appellant has led us to conclude that it was patently *unreasonable* for Porter to have suspected appellant of being in possession of contraband and therefore to have subjected him to further detention. While Porter may have been able to provide the trial court with "specific articulable facts," the rest of the definition was glaringly missing, to-wit: "taken together with *rational inferences from those facts* reasonably warrant the detention." *See Terry*, 392 U.S. at 21, 88 S.Ct. 1868 (emphasis added).

With regard to the first fact, we readily concede that Porter's training and experience in drug intervention may have provided some reason to have been suspicious of appellant stopping his vehicle abruptly on the Interstate. This fact, however, in and of itself will not support reasonable suspicion.

The next three facts, as described by Porter, are absolutely neutral as to any inference of involvement in drug trafficking. The fact that appellant was in a dress shirt and neck-tie traveling on the Interstate at 12:30 a.m. provides not even a scintilla of an inference that drug trafficking was afoot. Nor is the fact that appellant was returning from the city of Houston. In *Sokolow*, testimony from a DEA agent involved in the case indicated that one of the facts known about Sokolow prior to his detention in the airport was that his original destination was Miami, Florida "a source city for illicit drugs." 490 U.S. at 3, 109 S.Ct. 1581, 104 L.Ed.2d at 8. However, this fact was almost lost among the many other highly suspicious facts and circumstances known to the agents who were working surveillance of Sokolow over a period of several days. 490 U.S. at 3–5, 109 S.Ct. 1581, 104 L.Ed.2d at 7–9. We also view the fact that appellant took "several seconds" to recall where he had eaten with his sister earlier in the evening as providing no reasonable inference of drug trafficking, even combined with the other facts.

Finally, Porter described appellant as extremely nervous to the point that his voice and hands were shaking. A videotape of the incident was played for the trial court and is a part of the record before us. While most of the audio portion is missing, a review of the video portion does not portray appellant as shaking or acting in an excited manner. He appears cooperative, something Porter readily admitted during his testimony. Extreme nervousness has traditionally been a fact that law enforcement has used in its list of elements leading up to either reasonable suspicion or probable cause. *See e.g., Sokolow,* 490 U.S. at 3, 109 S.Ct. 1581, 104 L.Ed.2d at 8. Yet even combined with what we consider the only other "suspicious" fact, appellant's erratic driving, nervousness when encountering law enforcement will not be sufficient to provide a rational inference that appellant was in possession of contraband. From the totality of Officer Porter's testimony, the most that can be said is that he had "an inchoate and unparticularized suspicion or hunch" that appellant was in possession of contraband. This, for both Fourth Amendment and Article 1, section 9 purposes, was insufficient to permit the further detention of appellant. Were we to find reasonable suspicion from the particular facts of this case, we would be setting the stage for what Justice Marshall, in his dissent in *Sokolow,* saw to be the great threat of drug courier profiles:

> Reflexive reliance on a profile of drug courier characteristics runs a far greater risk than does ordinary, case-by-case police work of subjecting innocent individuals to unwarranted police harassment and detention. This risk is enhanced by the profile's "chameleon-like way of adapting to any particular set of observations." Compare, e.g. *United States v. Moore* (suspect was first to deplane), with *United States v. Mendenhall* (last to deplane), with *United States v. Buenaventura–Ariza* (deplaned from middle); *United States v. Sullivan* (one-way tickets), with *United States v. Craemer* (round-trip tickets), with *United States v. McCaleb* (nonstop flight), with *United States v. Sokolow* (changed planes); *Craemer,* supra (no luggage), with *United States v. Sanford* (gym bag), with *Sullivan,* supra (new suitcases); *United States v. Smith* (traveling alone), with *United States v. Fry* (traveling with companion); *United States v. Andrews* (acted nervously), with *United States v. Himmelwright* (acted too calmly).

*Sokolow,* 490 U.S. at 13–14, 109 S.Ct. 1581, 104 L.Ed.2d at 14–15, (all citations omitted from original).

We find, therefore, that the trial court erred in failing to suppress the contraband found as a result of the unreasonable detention of appellant. Since the error involved was of constitutional magnitude, we must reverse unless we can determine beyond a reasonable doubt that said error did not contribute to the conviction or punishment. TEX.R.APP. P. 44.2(a). Because without the contraband the State could not successfully prosecute appellant, we cannot say, beyond a reasonable doubt, that the error did not contribute to his conviction. *See Villalobos v. State*, 999 S.W.2d 132, 136 (Tex.App.—El Paso 1999, no pet.); *Graham v. State*, 893 S.W.2d 4, 8 (Tex.App.—Dallas 1994, no pet.). Appellate issue two is sustained. The judgment of the trial court is reversed and the cause remanded to said court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.