In The


 Court of Appeals


Ninth District of Texas at Beaumont


____________________



NO. 09-00-168 CR


____________________



WILL DIXON, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 410th District Court


Montgomery County, Texas


Trial Court No. 98-06-00767-A-CR






O P I N I O N


 Will Dixon was convicted of possession of a controlled substance and sentenced to
35 years. Dixon raises two issues challenging the trial court's refusal to suppress evidence
in his case. First, he argues that the traffic stop was illegal. Second, he argues that the
traffic stop was improperly prolonged, thereby creating a detention that was "groundless
and unlawful."

Background

 Montgomery County Deputy Constables Anthony Lewis and Steve Dorris were on
criminal interdiction patrol on U.S. Highway 59. Their practice was to stop a vehicle
which committed a traffic violation, and then "run a computer check on it for possible
warrants or anything of that nature, to try to detect any kind of criminal behavior taking
place." The officers saw the brake lights on Dixon's van flash in an "erratic" pattern as
the van approached a curve "known . . . as a dangerous curve through accidents[.]" As
Dixon entered the curve, the tires on the passenger side of the van crossed the white line
which separated the traffic lane from a merging lane on the right side of the highway. As
Dixon continued into the curve, the passenger side tires crossed the "fog line"on the edge
of the shoulder and drove on the shoulder for twenty to forty feet. The officers pulled
Dixon over at that time. 

 Lewis testified Dixon "admitted to the fact that his vehicle was having mechanical
difficulties, by his steering linkage was bad." Before writing a warning citation, Lt.
Dorris asked Dixon for permission to search the vehicle; Dixon refused permission. While
the officers were waiting for the police dispatcher to transmit the results of the license and
warrant check on Dixon, Lewis walked around the van with a dog trained to detect
narcotics by scent. The dog "alerted" to the back door of the van. Based on the dog's
alert, the officers searched the van without Dixon's consent; they discovered twelve and
a half pounds of cocaine, along with thirteen grams of marijuana. 

 Dixon filed a motion to suppress, which was denied. On appeal, Dixon challenges
the legality of the initial traffic stop and the legality of Lieutenant Dorris' decision -- made
before the dog's "alert" -- that "[Dixon] was free to go, but -- no, sir, the vehicle wasn't
free to go."

Standard of Review

 In a suppression hearing, the trial judge is the sole trier of fact and judge of the
credibility of the witnesses and the weight to be given their testimony. State v. Ballard,
987 S.W.2d 889, 891 (Tex. Crim. App. 1999). Reviewing courts afford almost total
deference to a trial judge's determination of historical facts supported by the record if the
findings are based on an evaluation of credibility and demeanor. Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997). A trial judge's determination of mixed questions
of law and fact that do not turn on an evaluation of credibility are reviewed de novo. Id. 
In reviewing a trial court's ruling on the application of law to facts, appellate courts are
to review the evidence in the light most favorable to the trial judge's ruling. Id. 

Point of Error One: The Traffic Stop

 Dixon asserts he committed no traffic violation and therefore the stop and resulting
search were illegal. Generally, before a motorist may lawfully be stopped by an officer,
that officer must have specific articulable facts to reasonably suspect the person stopped
is associated with criminal activity. Cunningham v. State, 966 S.W.2d 811, 812 (Tex.
App.-- Beaumont 1998, no pet.). A police officer may lawfully stop any motorist who
commits a traffic violation. McVickers v. State, 874 S.W.2d 662, 664 (Tex. Crim. App.
1993). In addition, in their "community caretaking" function police officers may stop and
assist someone a reasonable person would believe to be in need of help. Wright v. State,
7 S.W.3d 148, 151 (Tex. Crim. App. 1999).

 The Transportation Code provides in part:


 (a) An operator on a roadway divided into two or more clearly marked lanes
for traffic: 

 (1) shall drive as nearly as practical entirely within a single lane; and

 (2) may not move from the lane unless that movement can be made safely. 


Tex. Transp. Code Ann. § 545.060(a) (Vernon 1999).


 (a) An operator may drive on an improved shoulder to the right of the main
traveled portion of a roadway if that operation is necessary and may be done
safely, but only:

 (1) to stop, stand or park;

 (2) to accelerate before entering the main traveled lane of traffic;

 (3) to decelerate before making a right turn;

 (4) to pass another vehicle that is slowing or stopped on the main traveled 
 portion of the highway, disabled, or preparing to make a left turn;

 (5) to allow another vehicle traveling faster to pass;

 (6) as permitted or required by an official traffic-control device; or 

 (7) to avoid a collision.


Tex. Transp. Code Ann. §545.058(a) (Vernon 1999).

 Failure to maintain a single lane is not an inherently illegal act. Ehrhart v. State,
9 S.W.3d 929, 930 (Tex. App-Beaumont 2000, no pet.) Section 545.060 is not violated
unless the failure to maintain a single lane is unsafe or dangerous. Id. However, at the
suppression hearing, Officer Lewis testified that Dixon's weaving was unsafe: 

 Because of the road conditions in that curve, the erratic braking, the dropoff
on the improved shoulder to the unimproved shoulder with the loose gravel
and because of the accidents that have occurred in that area. 


 Lewis testified that he personally witnessed two accidents at that curve and "rolled
up on" a third. Lieutenant Dorris also testified that Dixon's actions were unsafe. His
testimony was as follows:

 [T]his is an extremely busy highway and it is rush hour traffic. It's
also common for vehicles to be entering from the Splendora area onto
Highway 59 from this way; and the fact that there is -- once you . . . get past
this point, it goes from an improved shoulder to unimproved shoulder . . .
I've seen vehicles that were involved in accidents as a result of leaving the
roadway in this area, striking the unimproved shoulder, causing them to lose
control of their vehicle.

 . . . .

 [Dixon's] driving behavior posed a potential threat to not only him,
but other motorists; and that's what drew my attention to him and, hence, the
reason for the stop, failing to maintain the single lane of traffic. 

 . . . .


 I was . . . concerned with whether or not he was going to veer off
into the feeder lane, the shoulder, or cause some other motorist on the
roadway to take some kind of evasive action. 


 When asked if his observations led him to believe that Dixon's vehicle was having
mechanical problems, Dorris answered: "Yes. Either mechanical problems or some kind
of impairment on the driver's behalf." 

 The court heard testimony that Dixon crossed the fog line by two feet, impinged on
a feeder lane which merged with Highway 59 at the curve, and drove partially on the
improved shoulder for twenty to forty feet. The trial court heard one of the officers
describe the vehicle's movements as "erratic" and "abrupt." The court heard testimony
that traffic on Highway 59 at that time was "medium to heavy" and that the curve was
dangerous. The court heard testimony that the improved shoulder changed to an
unimproved shoulder shortly thereafter, and that the sudden six-inch dropoff to the
unimproved shoulder had caused several wrecks. The court heard Lieutenant Dorris testify
that he believed Dixon's driving indicated "either mechanical problems or some kind of
impairment on the driver's part." The court heard Officer Lewis testify that Dixon
admitted "his steering linkage was bad." 

 The record supports the trial court's implicit holding that the stop was justified. 
Appellant's brief describes the officers' practice as "patrolling the outer limits of the 4th
Amendment[,]" and implies that the stop was made for "nefarious reasons." However,
an objectively valid traffic stop is not unlawful just because the officer had an ulterior
motive for making it. Crittenden v. State, 899 S.W.2d 668, 674 (Tex. Crim. App. 1995). 
As judge of the credibility of the witnesses who testified, the trial court reasonably could
conclude that the driving behavior described, under the conditions described, was
sufficiently unsafe to create a reasonable suspicion that Dixon had committed a traffic
violation, was impaired in some manner, or needed assistance. The traffic stop was
justified. Point of error one is overruled.

Point of Error Two: The Length of Detention

 Next, Dixon argues that "the seizure of Appellant and his vehicle was made without
reasonable suspicion or probable cause[.]" The following excerpts from Dixon's brief
address this second point directly:

 Because Appellant "tried to dominate the conversation" with Deputy Doris
[sic] the deputy decided that "He (Appellant) was free to go, but - no sir, the
vehicle wasn't free to go." . . . This event happened prior to the dog's
"alert." 


 The seizure of Appellant and his vehicle was groundless and unlawful. 

 Appellant's conviction should be reversed and the cause remanded for a
new trial.

 . . . .

 Deputy Doris' [sic] decision to detain Appellant's vehicle was made before
the dog's "alert." At that time Appellant - then on his way home to Iowa in
his vehicle along with his girlfriend and her children - was also detained.


 Doris' [sic] reasonable suspicion for Appellant's detention was "the way
he tried to dominate the conversation . . . it was indicative to me of nervous
behavior." (emphasis omitted). 

 Dixon's contention seems to be that there was a point during the stop when Dixon
would have been allowed to leave without the van, and that this indicates that there was
a second "seizure" which extended beyond the scope of the traffic stop and without
reasonable suspicion. 

 An investigative detention must be temporary and last no longer than is necessary
to effectuate the purpose of the stop. Davis v. State, 947 S.W.2d 240, 243 (Tex. App.
1997) (quoting Florida v. Royer, 460 U.S.491, 500, 75 L.Ed.2d 229, 103 S.Ct. 1319
(1983)). A detention which is not reasonably related in scope to the circumstances which
justified the detention violates the Fourth Amendment. Davis, 947 S.W.2d at 243. An
officer should employ the least intrusive means reasonably available to verify or dispel his
suspicions in a short period of time. Id. at 245. Detention of a traveler's vehicle is a
restraint on the traveler's liberty interest in proceeding with the traveler's itinerary, and
is therefore subject to the same constitutional limitations as an investigative detention of
an individual. Id. at 246 (citing U.S. v. Place, 462 U.S. 696, 708-09, 77 L.Ed.2d 110,
103 S.Ct. 2637 (1983)).

 During a traffic stop, an officer has the right to request a driver's license, insurance
papers, information on the ownership of the vehicle, the driver's destination, and the
purpose of the trip. Mohmed v. State, 977 S.W.2d 624, 628 (Tex. App.--Fort Worth
1998, pet. ref'd). In addition, it is reasonable for an officer to check for outstanding
warrants. Davis, 947 S.W.2d at 245, n.6. 

 Officer Lewis testified that he used the patrol unit's radio to call in Dixon's driver's
license information for a warrant check. Lieutenant Dorris testified that Dixon "tried to
dominate the conversation" with Dorris; the female passenger stated that they had stayed
in a hotel, although they made the trip to visit family; and the female passenger was unsure
whether they had just visited the Atlantic or Pacific ocean in Galveston. Lieutenant Dorris
therefore asked Lewis to walk the drug-sniffing dog around the vehicle while Dorris was
writing Dixon a warning citation. Dixon's driver's license information did not come back
until after Lewis took the dog around the vehicle. 

 A sniff of the outside of an automobile by a trained canine is not a "search" within
the meaning of the Fourth Amendment. U.S. v. Place, 462 U.S. 696, 707, 77 L.Ed.2d
110, 103 S.Ct. 2637 (1983). A canine sweep is much less intrusive than a search, and
discloses only the presence or absence of narcotics. Id. at 707. Nonetheless, to prolong
a traffic stop for a canine sweep for drugs, police must have reasonable suspicion that
drugs are present to justify the additional detention. See Veal v. State, 28 S.W.3d 832,
835 (Tex. App.--Beaumont 2000, pet. ref'd); Davis, 947 S.W.2d at 245-46. 

 However, the question before this court is whether reasonable suspicion is required
for a canine sweep when an individual has been legitimately detained for other reasons and
the sweep does not prolong the detention. In a case factually similar to this one, the Court
of Criminal Appeals suggested a distinction between a detention done only for the purpose
of conducting a canine sweep and a canine sweep made during a detention for a traffic
violation and warrant check. The Court of Criminal Appeals explained as follows:

 It remains unclear whether a canine sniff alone constitutes a detention, or
whether calling in a canine unit requires reasonable suspicion. In Place, [462
U.S. 696] the Supreme Court concluded that the law regarding investigative
detentions should apply when police seize an individual's luggage. The Court
did not decide whether a canine sniff in the absence of detaining luggage
constituted an investigative detention requiring reasonable suspicion.
Similarly, in Crockett v. State, [803 S.W.2d 308 (Tex. Crim. App. 1991)]
we found reasonable suspicion was lacking for a canine sniff and reversed
the conviction. But there, the police detained the defendant for the purpose
of conducting the canine sweep, so reasonable suspicion was required for the
detention itself. In the instant case, Walter was detained due to the traffic
violation and the warrant check. The canine search was not a cause of
detention, so Place and Crockett are not necessarily determinative.
Nevertheless, for purposes of this opinion, we will assume, as the parties do,
that reasonable suspicion is required for a canine sniff. 


Walter v. State, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000) (footnote omitted).

 From the testimony at the suppression hearing, the trial court could reasonably
conclude that Dixon was not subjected to any additional detention in order to carry out the
canine sweep. The dog walked around the van while the officers waited to receive the
results of the warrant check on Dixon's license, which is part of a routine traffic stop. See
Davis, 947 S.W.2d at 250, n. 6. This testimony by the officers distinguishes this case
from Davis, where police had completed the standard license and insurance checks without
incident but continued to detain the vehicle anyway. Id. at 241. The Davis court held that
the continued detention required reasonable suspicion because it deprived Davis of his
liberty interest in proceeding with his itinerary. Id. at 246. In contrast, the canine sweep
of Dixon's van did not impinge upon Dixon's itinerary any more than if Lewis had walked
around the van by himself while awaiting the results of the license check. We hold that
the trial court reasonably could conclude based on the testimony presented at the
suppression hearing that the canine sweep did not prolong Dixon's detention. Point of
error two is overruled. 

 The judgment of the trial court is affirmed. 

 AFFIRMED.

 PER CURIAM



Submitted August 30, 2001

Opinion Delivered December 19, 2001

Do not publish 


Before Walker, C.J., Burgess, and Gaultney, JJ.