

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-15-00419-CR

_____

ELVIS ELVIS RAMIREZ-TAMAYO, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 69523-E, Honorable Douglas Woodburn, Presiding

_____

October 5, 2016

## OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

We reverse.

A logical reasoning sequence based upon some "training and experience" — because drug traffickers have been seen breathing, then breathing is an indicia of drug trafficking. Because they normally have two hands, then having two hands is an indicia of drug smuggling. Silly — maybe, but one can wonder if that is the direction we are heading. Whether it be driving a clean vehicle, *Contreras v. State*, 309 S.W.3d 168, 171 (Tex. App.—Amarillo 2010, pet. ref'd), or looking at a peace officer, *Gonzalez-*

*Galindo v. State*, 306 S.W.3d 893, 895-96 (Tex. App.—Amarillo 2010, pet ref'd), *Contreras v. State,* 309 S.W.3d at 171; or looking away from a peace officer, *Gonzalez-Galindo v. State,* 306 S.W.3d at 896; or a young person driving a newer vehicle, *Gonzalez-Galindo v. State, supra*; or someone driving in a car with meal wrappers, *Deschenes v. State*, 253 S.W.3d 374, 383 (Tex. App.—Amarillo 2008, pet. ref'd); or someone driving carefully, *Contreras v. State*, *supra*; or driving on an interstate, *see Clatt v. State*, No. 07-07-0130-CR, 2008 Tex. App. LEXIS 7250, at *2 (Tex. App.—Amarillo September 29, 2008, no pet) (mem. op., not designated for publication) (wherein the official testified that I-35 was a "drug corridor"), most anything can be considered as indicia of drug trafficking to law enforcement personnel. Maybe this is because drug smugglers just happen to be human beings and being such, they tend to engage in the same innocuous acts in which law abiding citizens engage. *See Gonzalez-Galindo v. State*, 306 S.W.3d at 896 (observing that "[c]riminals come in all makes and colors. Some have hair, some do not. Some are men, some are not. Some drive cars, some do not. Some wear suits, some do not. Some have baseball caps, some do not. Some want attention, some do not. Some have nice cars, some do not. Some eat spaghetti, some do not. And, sometimes, some even engage in innocent activity."). The problem comes with distinguishing between innocent conduct indicative of nothing but everyday activity and innocent conduct indicative of crime. That is the hurdle we once again face here, and it is made difficult to clear due to the unasked questions by the State about the "knowledge, experience, and training" of its sole witness.

The witness we speak of is the deputy who stopped appellant for driving 78 mph on Interstate 40 when the posted limit was 75. He approached the passenger side of the stopped vehicle. Instead of lowering the car window, though, appellant opened the passenger door. That was suspicious to the officer because in his "training and experience" drug smugglers have lined car doors with drugs which act impedes a window's operation. Once the door was open, the deputy smelled cigarette smoke and a strong scent of cologne; so too did he see the car's ashtray full of cigarette butts. Those circumstances added to his suspicion because from his "training and experience" he knew that drug smugglers have used odors to mask the scent of drugs. Soon he discovered that the vehicle happened to be a rental with "no smoking" decals affixed to it, and appellant apparently was returning from some unknown casino to Miami, Florida. The deputy recalled from his "training and experience" that drug smugglers rent vehicles to transport their contraband. So, the presence of a rented vehicle heightened his suspicion that his detainee may be engaging in criminal activity. Also noted by the deputy was appellant's "severe" nervousness and failure to calm down after being told that he would only be receiving a warning ticket.[1]

So, as appellant sat in the deputy's patrol unit, he was asked if he would consent to a search of the rented car. Because the language barrier between appellant and the deputy hampered the latter's ability to comprehend if appellant acquiesced, the deputy decided to have a drug dog sniff the car.[2] The dog just happened to be at the scene

---

[1] According to the deputy, appellant ". . . was not able -- he was sitting in the front passenger seat of my patrol vehicle while I was speaking with him and he could never get comfortable. He was constantly shifting in the seat and crossing his arms and he couldn't sit still, even for just a few minutes." This continued after appellant was told that he would only be receiving a warning ticket.

[2] English was "a second language" to appellant, said the deputy. And though the deputy said the two could communicate, he later acknowledged that "[i]t was hard to tell if he was consenting [to the

when the decision was made. The animal indicated the presence of drugs, and the ensuing search uncovered multiple pounds of marijuana within the car's doors.

Appellant believed the search was unconstitutional and moved to suppress its fruits. A hearing was held, and, thereafter, the trial court denied the motion. Appellant then pled guilty to possessing between 5 and 50 pounds of a controlled substance. The sole issue before us involves the decision to deny the motion to suppress. Appellant believes the trial court erred in doing so because the deputy had no reasonable suspicion to prolong the detention after deciding simply to issue a warning ticket. We agree.

*Applicable Law*

Our analysis begins with mentioning various rules of law. First, in reviewing the trial court's ruling, we afford almost complete deference to its resolution of historical fact and credibility determinations, if supported by the record. *Leming v. State*, No. PD-0072-15, 2016 Tex. Crim. App. LEXIS 73, at *24 (Tex. Crim. App. April 13, 2016). However, legal conclusions are reviewed *de novo*; that is, we need not defer to the lower court's conclusions of law. *Id.* Falling within that realm is the question of whether the totality of the circumstances unfolding at the scene created reasonable suspicion to detain. *Id.* (stating that "[t]he ultimate question of whether [the officer] was indeed 'justified in stopping' Appellant's Jeep, we review *de novo*."). This is so because its existence is "not a function" of a witness' demeanor or credibility but rather of the legal significance arising from the essentially uncontested facts. *Id.* Consequently, the opinions of both the law enforcement officer and the trial court regarding the presence

---

search] or not just because of the -- he mainly spoke Spanish and he said, no, but it appeared to me like he was still saying, no, that there's no drugs in the car."

4

of reasonable suspicion have no control over our decision; we are free to resolve that legal question anew. *Brodnex v. State*, 485 S.W.3d 432, 436-37 (Tex. Crim. App. 2016).

Next, and as said in *Leming*, "[r]easonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Leming*, 2016 Tex. Crim. App. LEXIS 73, at *32. Its existence depends upon the presence of specific, articulable facts that, when combined with rational inferences from those facts, would lead an ordinary prudent officer to conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Leming,* 2016 Tex. Crim. App. 73, at *25-26, *quoting, Derichsweiler v. State*, 348 S.W.3d 906, 914-15 (Tex. Crim. App. 2011). As can be seen, the standard is objective, not subjective. *Id.* It matters not what the particular officer or officers involved in the stop subjectively intended or believed; instead, the focus lies on whether the totality of the circumstances were enough to create an objectively justifiable basis for the detention. *Id.* And, those circumstances not only include the detaining officer's knowledge and experience, *Shelton v. State*, No. 07-14-00173-CR, 2016 Tex. App. LEXIS 2867, at *7-8 (Tex. App.—Amarillo March 18, 2016, no pet.) (mem. op., not designated for publication), but also the presence of acts that may be either obviously criminal or innocent at first blush. Determining what falls within the former category is often an easy exercise. The same cannot be said with regard to the latter.

For instance, few would dispute that pointing a gun at a cashier of a local convenience store while also yelling "give me the money in the register" is activity readily indicative of criminal conduct. If the person engaging in that crime also

happened to be wearing a "Wellington Skyrockets" baseball cap, does wearing that cap become part of those criminal actions?[3] Admittedly, the actor wore it during the crime's commission. Furthermore, the law enforcement officer investigating the incident would most likely become aware of that fact, which would mean, in turn, that the fact and its link to the particular crime has become part of the officer's knowledge and experience. Yet, would one answer "yes" to the question we posed; few would say that wearing such a cap means the person is engaging in or about to engage in a robbery. And, we would agree; it merely is innocent activity.

Difficulty arises when innocent activity indicates more, however. Let us say that 1) there occurred five convenience store robberies within a one month span, 2) each occurred in the same neighborhood, 3) each occurred at 11:00 p.m., 4) each involved different individuals, 5) each individual walked up to the store from the north, 6) each leaned against a store wall to smoke a cigarette before entering, 7) each was seen surveying the vicinity while smoking that cigarette, and 8) each wore the aforementioned cap. To that scenario we add an officer 1) who investigated each of those robberies, 2) knew of the circumstances just mentioned, 3) happened to be driving by a convenience store in the same area of those other crimes at 10:58 p.m., and 4) happened to see someone wearing the same baseball cap approach from the north, stop outside to light a cigarette and begin to look around. No doubt walking up to a convenience store at that time from the north while wearing such a cap is, in and of itself, innocent activity. But in combining those indicia not only with the others but also

---

[3] Of course, if it were a Memphis High Cyclone who was asked, his answer may well be "heck yeah!"

with the officer's knowledge and experience, the innocent activity may mean much more.

Whether those innocent activities is enough to create reasonable suspicion that crime is afoot depends on whether they indicate the imminence of criminal conduct when viewed as a whole. *Leming*, 2016 Tex. Crim. App. Lexis 73, at *25. To gain some perspective of what that means we turn to other judicial opinions for guidance. The first we consider is *Arguellez v. State*, 409 S.W.3d 657 (Tex. Crim. App. 2013). It tells us that the focus lies not upon whether the conduct being viewed is innocent or criminal but rather upon the degree of suspicion attaching to the behavior. *Id.* at 663. In *Arguellez*, the conduct consisted of someone photographing people at a public pool from a parking lot. That behavior did not indicate crime was afoot, according to the court. *Id.* at 664.

Next, we consider the words of the court in *Guerra v. State*, 432 S.W.3d 905 (Tex. Crim. App. 2014). They tell us that the determination is "based upon the specific facts of each specific case. . . ." *Id.* at 912 n. 5. That is, the particular facts involved in the case at issue are viewed in the context of each other as opposed to the context of some other case or cases, and, when so viewed, they are determinative. Our own observations in *Gonzalez-Gilando* echo this when we said that "just because an officer once encountered a bald male who ate spaghetti while wearing a suit who later drove away in a particular car and ultimately engaged in criminal conduct does not permit him to rationally deduce that everyone else who happens to do the same things may also be engaging in misconduct." *Gonzalez-Gilando*, 306 S.W.3d at 896. Each case is fact specific. It is not enough to simply say that because some innocent activity was linked

7

to crime in some prior case, an officer who knew of that activity and perceived it unfolding before him would *ipso facto* have basis to reasonably suspect that a crime is about to occur. Much depends upon the activity and the degree of suspicion reasonably attaching to it under all circumstances then unfolding.

The words used in *Wade v. State*, 422 S.W.3d 661 (Tex. Crim. App. 2013) also bear mentioning. After first stating that "[t]he facts that an officer relies on to raise suspicion that illegal conduct is afoot need not be criminal in themselves," *id.* at 670, our Court of Criminal appeals then cautioned that ". . . the totality of the suspicious circumstances that an officer relies on 'must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them.'" *Id., quoting, Crockett v. State,* 803 S.W.2d 308 (Tex. Crim. App. 1991); *Brown v. Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)). This admonition seems most applicable in the area of profiling.

Profiling consists of little more than the informal compilation of characteristics believed to be typical of persons unlawfully engaging in certain criminal activity, such as drug trafficking. *Boyett v. State*, 485 S.W.3d 581, 591 (Tex. App.—Texarkana 2016, pet. ref'd), *quoting*, *Reid v. Georgia*, 448 U.S. 438, 440, 100 S. Ct. 2752, 65 L. Ed. 2d 890 (1980) (per curiam). Often an officer detains someone because the person exhibited one or more of those characteristics. That they may be useful in initially capturing the officer's attention to a situation is beyond doubt. But, the appearance of those characteristics in a particular situation do not *ipso facto* authorize a temporary detention. As observed in *Boyett*, "basing reasonable suspicion on the mere existence of a profile . . . could allow an investigating officer to convert ordinary, nonsuspicious

8

behavior into reasonable suspicion by merely testifying that the behavior fits a profile." *Id.* at 592 n. 11. Consequently, a "reflexive reliance" on such characteristics is to be avoided. *See id.* at 591 (describing such "reflexive reliance" as problematic according to Justice Marshall in *United States v. Sokolow*, 490 U.S. 1, 13, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (Marshall, J., dissenting)). Such reliance "runs a far greater risk than does ordinary, case-by-case police work of subjecting innocent individuals to unwarranted police harassment and detention." *Veal v. State*, 28 S.W.3d 832, 837 (Tex. App.—Beaumont 2000 pet. ref'd) (wherein the officer invoked his knowledge of and experience with drug traffickers and noted that one or more of the innocuous activities performed by Veal are also performed by such criminals). "This risk is enhanced by the profile's 'chameleon-like way of adapting to any particular set of observations.'" *Id.*

Avoiding the unacceptable consequences of reflexively relying on innocent characteristics profiled from prior crimes requires explanation of why they are unusual or suspicious under the circumstances. *See id.* (stating that reasonable suspicion must be based ". . . on whether the behavior observed is unusual (although, not necessarily illegal) and whether the officer can explain why it is suspicious."). In other words, unusual behavior may fit the profile of someone who engages in a particular kind of crime. But what elevates it to the level of reasonable suspicion is not that it fits a profile but that it is unusual and the officer can explain why it is suspicious in the particular scenario before him. *Id.* That is, the officer must explain why the activities are unusual and, therefore, meaningful in the specific case under assessment. To reiterate what we said in *Gonzalez-Gilando*, just because that bald guy committed a crime while wearing a

9

suit and after eating spaghetti does not mean that other bald guys who wear suits while eating spaghetti are about to engage in crime too. *Gonzalez-Gilando v. State*, 306 S.W.3d at 896.

With the foregoing guidance, we turn to the particular case before us.

*Application of the Law*

As previously mentioned, appellant does not question the lawfulness of his initial stop for speeding. His complaint lies with the deputy's refusal to release him upon being told that he would receive a warning ticket. Allegedly, the deputy lacked reasonable suspicion to continue the detention. *See Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492, 496 (2015) ("a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."); *Thomas v. State*, 420 S.W.3d 195, 201 (Tex. App.—Amarillo 2013, no pet.) (holding the same). Whether he is correct depends on the evidentiary record developed at the suppression hearing.

The hearing was rather abbreviated. Only one witness testified, and it happened to be the deputy who detained appellant. The deputy informed the trial court that he had reasonable suspicion to believe appellant had engaged in transporting drugs based upon 1) appellant's nervousness, 2) the odor of cigarette smoke in the car despite "no smoking" decals appearing on the vehicle, 3) the presence of an ashtray full of cigarettes, 4) the "overwhelming" odor of cologne, 5) appellant's opening the passenger side car door, 6) the deputy's experience that rental cars usually have operative windows, 7) the deputy's training or experience that drug smugglers use rental cars to transport contraband, 8) the deputy's experience that drug smugglers "commonly"

10

"stuff[]" contraband in car doors which act impedes the window's normal operation, 9) the deputy's knowledge and experience that drug traffickers use strong odors to mask the odor of the drugs, 10) the deputy's experience that a "chain-smoker' normally "cracks" the window when driving, 11) appellant, who appeared to be chain smoking, drove with his windows up, and 12) appellant was returning to his Miami, Florida home from some unknown "casino."

Smoking in a car while driving despite the presence of "no smoking" stickers, wearing cologne, driving a rental car, driving with windows rolled up, opening a car door, not rolling down a car window, travelling to casinos, and driving to Miami, Florida are activities committed by people who have no relationship to criminal activity. Alone, none of them implicitly or explicitly connote criminal activity. Nor to the reasonable, common man would they connote such activity if they occurred all together. Yet, the test is not what the common man thinks but what the reasonably prudent officer would perceive under the same circumstances. And, that requires us to view the situation through the prism of the detaining officer's knowledge and experience. *Leming*, 2016 Tex. Crim. App. LEXIS 73, at *25-26, *quoting Derichsweiler v. State, supra.*

To one trained and experienced in the fields of law enforcement, smuggling, human behavior, and drug interdiction, each of the aforementioned indicia have special significance, opined by the deputy here. Yet, what of the deputy's training and experience and knowledge — what does the record say about it. Our answer is, not much. We are told that he had been employed by the Potter County Sheriff's department for nine years, was a jailer for a year or two, was assigned to the Criminal Intelligence Unit, and "mainly work[ed] the highway and interdiction functions." The

11

extent of his educational background in general and training as a jailer, deputy, or member of Criminal Intelligence Unit went unmentioned, however. Nor were we told of either the nature of the tasks he performed in those capacities or the experience gained through them. Whether performing "highway and interdiction functions," being a member of the Intelligence Unit, and being a jailer gave him any expertise in spying drug smugglers is a matter unaddressed in the record. Whether they afforded him some expertise in the area of either human or criminal behavior was not developed. Whether those jobs afforded the deputy opportunity to be part of five, ten, twenty, a hundred or zero drug investigations is unknown.[4] Also unknown is the length of time served by the deputy in his role with the Criminal Intelligence Unit and "highway and interdiction[s]." For all we know, he may have been relatively new to each, and his experiences related thereto quite minimal. The record just does not say.

Instead, the State simply proffered evidence of job titles and employment categories. We were then left to either guess at their scope and substance, if any, or implicitly invited to assume that those titles and categories imbued the deputy with some form of special training, knowledge and expertise. But, neither we nor the trial court are free to fill the void through speculation. Labels themselves mean little, and care must be taken to avoid assigning some level of substance to them merely because they may sound important. And, aside from the deputy simply invoking his "knowledge, training

---

[4]The deputy did say "yes" when asked if he had "commonly seen people that are trafficking drugs to stuff the passenger doors" with contraband. Yet, the State neglected to develop a factual basis to support the deputy's opinion about what was "commonly seen." And despite being assigned to "highway and interdiction," the deputy testified that he had only seen it "a few times" on highway I-40. What number comprises "a few times" is unknown. Also unknown is whether he encountered instances where contraband was not found in the doors of vehicles utilized by drug smugglers. Furthermore, if the deputy's experiences with drug interdiction were as great as the State would have us assume but he encountered only a "few" instances of drugs being hidden in car doors, one could well deduce that drugs are not "commonly seen" in the doors of cars being driven by smugglers down I-40.

12

and expertise," the State did little to illustrate of what it consisted or how it was garnered.

One cannot ignore the fact that when it comes to uncovering or investigating crime, law enforcement personnel approach the status of experts. Such are not areas or fields generally within common knowledge. *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (stating that 1) expert testimony assists the trier of fact when his knowledge and experience on a relevant issue are beyond that of the average juror, 2) such testimony helps the trier of fact understand the evidence or determine a fact issue, but 3) when the factfinder is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the testimony); *Tyson Fresh Meats, Inc. v. Abdi*, No. 07-12-00546-CV, 2014 Tex. App. LEXIS 5693, at *15-16 (Tex. App.—Amarillo May 28, 2014, pet. denied) (mem. op.) (stating the same). So, to some extent, they should be treated as experts. That is, they should be shown to have knowledge, skill, experience, training, or education about the topic on which they speak before their testimony can be deemed reliable. Without such a showing, we are denied the requisite prism through which to view the circumstances underlying the purported existence of reasonable suspicion in prosecutions like that at bar. And, without that prism, we cannot say that normally innocent acts upon which a law enforcement official (like the deputy at bar) relied to develop reasonable suspicion were sufficiently unusual to be distinguishable from the activities of innocent people under the same circumstances so as to clearly, if not conclusively, set appellant apart from the generally innocent people driving down I-

40. This is especially so given some of the general observations utilized by the deputy to develop his case of reasonable suspicion.

For instance, the deputy testified that people who smoke while driving do so with a window open. Because no window in appellant's vehicle was open, that circumstance suggests misconduct, given the deputy's "knowledge, training and experience." Had the deputy explained the extent of his "knowledge, training and experience" we could assess whether the opinion is more than some personal belief about how smokers behave or truly a reliable description of a behavior which merits consideration. Had his "knowledge, training and experience" been developed maybe we could have seen some quantifiable relationship between smoking, smoking with windows rolled up, and the transportation of narcotics. Instead, the State left us to wonder about the actual existence of a relevant nexus. We were left to accept as suspicious what the deputy said was suspicious merely because he said it was suspicious given his unexplained level of "knowledge, training, and experience."

The same seems true regarding the deputy's opinion about the significance of appellant's nervousness. Not only was appellant extremely nervous but remained so after being told that he would receive only a warning for committing the traffic offense.[5] Normally people relax when the latter happens, according to the deputy's "knowledge, training and experience." Admittedly, nervousness may be a factor in determining reasonable suspicion, though it is "not a particularly probative" one. *Wade v. State*, 422 S.W.3d at 670-71. Both the innocent and guilty exhibit such signs when in the presence of law enforcement personnel, and, "the more the accusatory the questions that an

---

[5] The deputy testified that appellant was "not able -- he was sitting in the front passenger seat of my patrol vehicle while I was speaking with him and he could never get comfortable" and "constantly shifting in the seat and crossing his arms and he couldn't sit still, even for just a few minutes."

officer asks, the more nervous [an innocent] citizen legitimately becomes." *Id* at 671. It would have been beneficial to know whether the "knowledge, training and experience" upon which the deputy based his opinion involved circumstances attendant to some normal traffic stop or one where the officer wants to search for drugs. We can see how one stopped for speeding would be relieved to hear that he will only receive a warning and then be allowed to leave. But those are not the circumstances here. We have before us a traffic violator who 1) spoke English as a second language (which circumstance, according to the deputy, may foster nervousness), 2) was made to sit in the patrol car, 3) was not free to go despite being told about receiving only a warning ticket, and 4) made to undergo further interrogation about whether the vehicle carried weapons, large sums of cash, "meth," "cocaine," "heroin," or "marijuana."[6] We need help in accepting the notion that a normal person should somehow feel relieved upon being told that he is released from a minor offense like speeding while thereafter being retained within the confines of a patrol car and undergoing interrogation about a serious offense like transporting narcotics and carrying weapons across the country. Such assistance could have come from a greater development of the deputy's "knowledge, experience, and training," if any, regarding human behavior in those situations. But, it was not afforded to us. Maybe individuals situated in the same circumstances as appellant do relax. Maybe they do not. Our bet would be on the latter given what was said in *Wade* about how even the innocent become nervous as the accusative nature of the questions rise. Nevertheless, without the added assistance mentioned, we have trouble with the reliability of the deputy's opinion that appellant should have relaxed and because he did not, it was suspicious.

---

[6] A translator was present during the suppression hearing.

The same is true of appellant's smoking and wearing cologne. People smoke cigarettes in cars while driving. Indeed, that act is so common manufacturers designed cigarette ashtrays into their vehicles. So too is wearing fragrances a commonplace event. If this were not so then seldom would we be accosted by the myriad aromas wafting through the air at the entrances of many department stores. And, if both the overpowering scent of cologne and the presence of cigarette smoke could mysteriously dissipate upon entry into a car, many of us would not have been bothered as a child by that parent who happened to strike up his Pall Mall after dousing himself with Aqua Velva in the morning. Yet, those common activities became unusual and indicative of drug smuggling when performed on an Interstate highway, according to the deputy. As before, this opinion too was based on his "knowledge, training and experience," which experience consisted of knowing that drug dealers sometimes try and mask the odor of drugs. No doubt, the latter is true. Detergent has been found scattered across the rear seat and floor of a vehicle to disguise the scent of drugs. *E.g. Strauss v. State*, 121 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, pet. ref'd); *accord, Parker v. State*, 297 S.W.3d 803, 811 (Tex. App.—Eastland 2009, pet ref'd) (involving detergent). So too has powdered carpet cleaner been used for that purpose, *e.g. Estrada v. State,* 30 S.W.3d 599, 603 (Tex. App.—Austin 2000, pet. ref'd), as has fabric softener, *e.g. Palacios v. State*, 319 S.W.3d 68, 75 (Tex. App.—San Antonio 2010 pet. ref'd), and coffee grounds left in a can to surround the narcotic. *E.g. Garcia v. State*, 327 S.W.3d 243, 246 (Tex. App.—San Antonio 2010 no pet.). There has also been an instance where drugs were discovered in a bag surrounded by clothes, mustard, coffee and cologne. *Mulato v. State*, No. 14-94-01059-CR, 1997 Tex. App. LEXIS 1354, at *2 (Tex.

16

App.—Houston [14th Dist.] March 20, 1997, pet. ref'd) (not designated for publication). But here, there was no fabric softener, mustard, coffee, or detergent. There was no air freshener dangling from the rear view mirror as was also present in *Estrada.* Nor was there drugs stuffed in a bag surrounded by cologne and other masking agents. Instead, the deputy encountered an individual who was doing something quite ordinary, that is, smoking and apparently wearing cologne.[7]

Had the deputy or any other law enforcement official upon whom he garnered his "knowledge, training and experience" encountered a scenario like that at bar, as opposed to those in *Estrada*, *Palacios*, *Parker*, *Garcia*, or *Strauss*? We do not know. Or is the deputy simply extrapolating from scenarios like those in *Estrada*, *Palacios*, *Parker*, *Garcia*, and *Strauss* that the presence of any aroma that may commonly be found in a car and that has the potential of masking some other odor means drugs may be present; we do not know. Nor do we know the number of times the presence of cigarette smoke and cologne has not led to the discovery of drugs or if the number is sufficient to justify any logical correlation. Such information or any other that further expounded upon the deputy's "knowledge, experience and training" may well have helped us determine whether his opinion about a nexus existing between cigarette smoke, cologne, and drugs was truly reliable or just some over generalized observation. Without that information, though, we again hesitate to simply accept the proposition that appellant's smoking and wearing cologne was suspicious.[8]

---

[7] We say "apparently" because the deputy was not asked to describe whether the cologne was on appellant's person or somehow sprinkled throughout the car.

[8] Incidentally, and somewhat frustratingly, cigarette smoke can often be encountered in unexpected locations. It is not uncommon to enter a non-smoking hotel room only to smell wisps of burnt tobacco lingering in the drapes, carpet and walls. The same is true of rental cars and smoke hidden in their seats visors, headliners, or any other fabric to which the burnt tobacco molecules may attach.

That the vehicle was rented also carried some significance to the officer, based on his "knowledge, experience and training." We accept the likelihood that people who have rented cars have also possessed drugs within them at one time or another. But, so too do we accept the likelihood that people have rented cars without engaging in such criminal conduct. The deputy was not asked to explain whether, from his "knowledge, training or experience," he could opine if one scenario happened more than the other or if the former occurred to such an extent so as to provide rational basis from which to infer some significant nexus between rental cars and drugs. Indeed, if in a hundred traffic stops on an Interstate and involving rental cars only one driver was found to be transporting drugs, it would strain logic to accord that ratio as a basis for inferring a rational link between rental cars and drugs. If in the same number of stops, the incidence of finding drugs was greater, then maybe the inference would gain rationality, however. But, the deputy was not asked to provide useful data from which any link could be established. Nor was he asked to disclose the information contained within his unexplained "knowledge, training and experience" which could support such an inference.

As before, we were left by the State to merely accept his unsubstantiated opinion about some unquantified nexus between rental cars on an Interstate and the transportation of drugs. This is quite troubling given that the situation at bar differed from that in *Byron v. State*, No. 07-05-0131-CR, 2006 Tex. App. LEXIS 4650 (Tex. App.—Amarillo 2006, pet. ref'd) (mem. op., not designated for publication). In *Byron*, the telling feature was the omission of Byron's name on the rental agreement as either

---

Indeed, appellant was free to smoke in the rental car he drove here if he cared to pay a $250 cleaning fee, according to the rental agreement. Sadly, people ignore no smoking signs, but because they do does not mean they are dealing drugs.

18

the lessee or as a designated driver.  *Id.* at \*4.  While we found that indicia sufficiently odd or unusual to factor into the reasonable suspicion equation, the same cannot be said simply of encountering someone who rented a car and driving that car even if he is also smoking and wearing cologne.  More information is needed before we can accept the conclusory opinion offered by the State via the deputy.

"Experience, knowledge, and training" also led the deputy to believe that appellant's opening the passenger side door as opposed to rolling down the window was suspicious.  With regard to this matter, he did provide a basis for his supposition.  It allegedly consisted of past instances where the presence of drugs in the door impeded the window's operation.  In other words, windows in a rather new car like that being driven by appellant should work.  If they do not, then it may be that something is in the door preventing them from working.  To the extent that the hypothesis may be founded upon "experience, knowledge, and training," it nonetheless lacks applicability here for one simple reason.  No evidence appears of record indicating that anyone attempted to test it.  The deputy did not try to open the windows before deciding to search for drugs. Nor did appellant try; when asked if appellant "attempted to roll down the window *at all,*" the deputy said "no." (Emphasis added).  The deputy's purported suspicion could have easily been verified or negated had he just asked appellant to communicate through the window; that would have revealed whether or not it worked.  *See Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014) (stating that "[r]easonable suspicion is not a carte blanche for a prolonged detention and investigation . . . [a]n officer must act to confirm or dispel his suspicions quickly.").

What we have here is a mere leap from the fact that appellant opened the car door to the assumption that the car windows do not work because the doors are stuffed with drugs.[9] There may be other reasons why someone opens a door rather than a window. One of those reasons may well be a circumstance also mentioned by the deputy. To him, appellant seemed "confused" when the deputy opted to approach the passenger-side door as opposed to the driver-side door. Nor can we ignore the deputy's own testimony regarding the number of times he had encountered drugs being hidden within the doors of a car driven on the Interstate. Again, that number was just "a few." Such limited experience makes a leap from 1) opens door to 2) drugs in door little more than a hunch.

With that, we come full circle. In effect, the process utilized by the deputy to justify the continued detention of appellant likens to that used in profiling. Again, the articulable facts he recited as constituting reasonable suspicion are not inherently criminal. To give them significance, the deputy searched his "knowledge, training and experience." The breadth of that "knowledge, training, and experience" was explained by no one. Nevertheless, from it he formed various opinions about what does and does not look like suspicious activity. Whether the investigations, training and experiences remembered (and used as a basis for those opinions rendered) actually involved facts similar to those before us is unknown. That is problematic since the opinions appear over generalized in some instances, *e.g.* nervousness, the use of masking agents, and the presence of a rental vehicle. In others, they may have been based upon facts

_____

[9] To the extent that the State may utilize the discovery of drugs in the car doors to bolster the supposition that the windows did not work, we must remember that the pertinent facts are those which an objective officer knew before detaining the suspect. Information obtained after the detention is irrelevant. If this were not so, then the eventual discovery of contraband alone would be enough to justify the stop, but that is not how the Fourth Amendment works.

different from those at bar, *e.g.*, windows that could not open indicating the presence of contraband. While in others, they may have simply been derived from his personal viewpoint, *e.g.,* driving 75 mph on an Interstate with windows down.[10]

Each indicia at bar could have significance or not. It was dependent upon the State and deputy to explain why they did. Merely offering conclusory opinions derived from an unknown data base does not instill us with confidence about their reliability and accuracy.[11] As stated in *Ford v. State*, 158 S.W.3d 488 (Tex. Crim. App. 2005), "[m]ere opinions are ineffective substitutes for specific, articulable facts in a reasonable-suspicion analysis." *Id.* at 493. Without proof of their substantive reliability they are not enough to raise the totality of the circumstances before us to the level of reasonable suspicion.

Wearing a Wellington Skyrockets baseball cap while walking up to a convenience store at 11:00 p.m. does not mean crime is afoot simply because someone at some time and place once robbed such a store while wearing some baseball cap. That is little more than we have here, a reflexive reliance on past innocent activity that may have happened to have been seen at some crime scene. More was needed The deputy and the State had to explain why the activities and circumstances relied on here were "'. . . sufficiently distinguishable from [the activities] of innocent people under the same

---

[10] Other instances did not even appear in the record. For instance, the State represents in its appellate brief that the rental agreement indicated the car was not to leave Florida. That the agreement says as much is true. The suggestion that such was a factor considered by the deputy is not. The deputy testified that he secured the rental agreement from appellant. When he did so was not disclosed. Nor did he testify that he read it before deciding to continue appellant's detention and search for drugs. That someone later stumbled upon the provision cannot be used to justify the search. The same is true regarding its comment that appellant "could not roll down the window." As illustrated earlier, the deputy admitted that appellant did not try to roll it down. Nor did he try to do so before searching the vehicle.

[11] We do not attempt to comment on the deputy's credibility. Indeed, we assume that what he says is true. Our decision is based upon the failure to establish the reliability of his opinions regarding the significance of the facts before us. More is needed than simply an invitation by the State to blindly accept what he says.

circumstances [so] as to clearly, if not conclusively, set the suspect apart from [innocent people].'" *Wade v. State*, 422 S.W.3d at 670.

The trial court erred in denying the motion to suppress. The totality of the circumstances at hand did not rise to the level of reasonable suspicion under the particular circumstances at hand. In other words, the deputy lacked reasonable suspicion to prolong appellant's detention once he decided to end the purpose of the original stop by opting to give appellant a warning ticket. Furthermore, the trial court's error was harmful since it permitted the State to base appellant's conviction upon tainted evidence and no other. Accordingly, we reverse the judgment of conviction and remand the cause to the trial court.

Brian Quinn
Chief Justice

Publish.